IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 49126-5-II |
| Respondent, | |
| v. | |
| ELLIOTT JOHNNY RUDOLPH, | UNPUBLISHED OPINION |
| Appellant. | |

JOHANSON, J. — Elliott J. Rudolph appeals his conviction and sentence for second degree rape. Rudolph argues that the State presented insufficient evidence to support his conviction, that the "reasonable doubt" jury instruction was improper, and that the prosecutor committed prosecutorial misconduct in closing and the trial court accordingly abused its discretion when it denied Rudolph's motion for a new trial. Rudolph further argues that the trial court abused its discretion when it imposed a community custody condition to obtain a domestic violence evaluation and legal financial obligations (LFOs) without proper inquiry. Rudolph also raises a number of issues in a statement of additional grounds (SAG).[1] We affirm Rudolph's conviction

---

[1] RAP 10.10.

but remand for the trial court to strike from his sentence the domestic violence evaluation community custody condition and to reconsider whether to impose discretionary LFOs.

FACTS

I. JURY TRIAL

A. STATE'S WITNESSES

1. VICTIM'S, FAMILY'S, AND FRIENDS' TESTIMONY

On October 18, 2013, when she was 16, AS[2] drove to a party with a group of people that included Rudolph, then 19. AS and Rudolph were close friends and spent time together daily, although their friendship was platonic. AS, who was a lesbian, had repeatedly rejected Rudolph when he "hit on" her, and although AS and Rudolph sometimes said that they "loved" each other, AS meant that she loved Rudolph "as a friend." 1 Report of Proceedings (RP) at 93, 122. A few months prior, AS and Rudolph had a falling out when Rudolph slept with AS's former girlfriend, but AS and Rudolph had "patch[ed] . . . up" their friendship by October. 2 RP at 220.

AS had an alcohol problem at the time, including binge drinking, and while in the car, she drank vodka with the others. Another person in the car, Dalvin Hale, age 23, estimated that AS consumed "about 3/4 of a fifth of a bottle of vodka" that evening. 3 RP at 417. At some point, Hale saw Rudolph helping AS walk. By the time the group arrived at their destination, AS "was drunk," and she remembered only "being in the car." 1 RP at 89. Her next memory was being in Rudolph's bedroom, where she went "in and out of consciousness." 1 RP at 90. Rudolph "tried

---

[2] Pursuant to Division Two General Order 2011-1 ("in all opinions . . . in sex crime cases, this Court shall use initials or pseudonyms in place of the names of all witnesses known to have been under the age of 18 at the time of any event in the case"), the victim's initials are used.

to kiss" AS, and she reciprocated briefly "because [she] was drunk," but then she "told him to stop" and they fell asleep. 1 RP at 90, 93. At some point, AS awoke to Rudolph "having sex with" her. 1 RP at 90. AS was too intoxicated to move or scream; she held her breath in an effort to make Rudolph stop. Rudolph noticed that AS was not breathing, checked her pulse, and then "flipped [her] over and continued having sex with" her. 1 RP at 99.

AS was uncharacteristically reticent the day following the incident. Because she was embarrassed by what had happened, AS was reluctant to tell anyone. Four days after the rape, AS, who was suffering pelvic pain, asked her friend's mother, Denise Renfro, to take her to urgent care, where AS told the urgent care doctor that she had been raped. AS told neither Renfro nor the urgent care doctor the identity of the person who had raped her. AS later told her mother about the rape, again without revealing Rudolph's identity, and AS's mother took her to a hospital, where she was diagnosed with a urinary tract infection (UTI). AS told the doctor that she had been raped but that she did not know her attacker's identity.

Later, on the day that AS's mother took her to the hospital, AS revealed to her mother who had raped her, and AS's mother called the police. AS provided the police with her clothes from the night of the rape—pants, two pairs of underwear, and a sweatshirt that AS had borrowed from Rudolph—and allowed an officer to take photographs of text messages between AS and Rudolph after the incident.[3]

---

[3] Without objection, the trial court allowed the State to remove one exchange from the text message conversation. This exchange referred to previous allegations against Rudolph made by AS's former girlfriend.

2.    URGENT CARE DOCTOR'S TESTIMONY

Without objection, Dr. Michael Wilmington, who had examined AS at the urgent care, discussed the potential causes of a UTI. These included sexual intercourse, particularly when a woman had sexual intercourse for the first time. When a woman first has intercourse, she "will be a little more set up for [a UTI] just because she hasn't necessarily been taught about how to prevent UTIs when . . . sexually active." 2 RP at 354.

When Dr. Wilmington examined her, AS did not appear to have injuries from the rape. However, a lack of physical injury was "very common" following a rape. 2 RP at 347.

3.    POLICE AND FORENSIC SCIENTIST TESTIMONY

Officer David Jensen collected AS's clothing from the night of the rape and provided it for forensic testing. Forensic scientists Laura Kelly and David Stritzke, who tested the underwear, explained their findings. Kelly found semen stains on the interior crotch of the underwear and observed two sperm cells. Stritzke found Rudolph's deoxyribonucleic acid (DNA) on the interior of the same underwear, as well as a "trace component" of DNA, at "such a low level that it wasn't suitable for comparisons," from an unidentified person who was probably male. 4 RP at 623-24. Stritzke noted that it was "not unusual" to find "trace components" of DNA "in items of clothing." 4 RP at 645.

B.  DEFENSE WITNESSES

Rudolph did not testify in his defense and relied upon the testimony of his family, who had not heard any noise from his bedroom on the night of the rape, and a forensic science consultant. The consultant discussed the presence of the unknown male's DNA on AS's underwear and the possibility of Rudolph's DNA transferring onto the underwear.

4

C. JURY INSTRUCTIONS AND CLOSING ARGUMENT

Both Rudolph and the State proposed that the jury be given the reasonable doubt jury instruction, 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 93 (4th ed. 2016) (WPIC), including that "[a] reasonable doubt is one for which a reason exists." Clerk's Papers (CP) at 64. The trial court instructed the jury using the proposed pattern instruction.

In closing argument, the prosecutor argued that the evidence confirmed AS's account. The prosecutor stated that it made sense that AS was "blacking out and passing out" from the amount of alcohol she had consumed and emphasized that Rudolph's sperm cells were found inside AS's underwear. 4 RP at 794. And without objection, the prosecutor discussed Dr. Wilmington's testimony about UTIs, stating,

> She got a [UTI], and it's true, there's more than one way that can be caused, but we heard from Dr. Wilmington that it is very common after a first sexual experience, penile-vaginal sex that is, that girls will develop a UTI, and that she started having that pain and started telling others about it almost immediately right afterwards, after that night. That again corroborates that she had sex that night.

4 RP at 797. The prosecutor further noted that AS "[was] gay. . . . There's no reason to think that this would've been consensual in the first place." 4 RP at 816.

Rudolph discussed the UTI evidence in closing and pointed out that Dr. Wilmington had testified that sexual intercourse was not the only cause of a UTI. He argued that "there was no testimony at all from [AS] or from anybody that this was her first sexual experience, so I don't want you to take that argument . . . as fact." 5 RP at 836. Rudolph stressed testimony from AS's mother that AS was sexually active with her ex-girlfriend, the presence of an unknown male's DNA in AS's underwear, and the possibility that Rudolph's DNA had transferred onto AS's underwear when she slept in his bed. Rudolph also argued that AS "set [Rudolph] up" and planted

his DNA in her underwear as revenge for Rudolph sleeping with AS's prior girlfriend.  5 RP at 867.

## II.  VERDICT AND MOTION FOR A NEW TRIAL

The jury found Rudolph guilty of second degree rape.  Rudolph subsequently moved for a new trial under CrR 7.5, in relevant part on the basis of prosecutorial misconduct for discussing AS's prior sexual history in closing.  Rudolph noted that before trial, the State had moved to bar Rudolph from inquiring into AS's prior sexual history.  Although the trial court had in fact reserved its ruling on the State's motion in limine and never revisited that ruling, Rudolph argued that it was prosecutorial misconduct to "violat[e] the . . . [o]rder."  CP at 120.  As a side issue, Rudolph also briefly alleged juror and witness misconduct, although the trial court declined to hear argument on the subject because it had not been briefed.

The State responded to the arguments raised in Rudolph's motion by arguing that the prosecutor had "merely recounted the doctor's trial testimony" and "argued that the fact the victim developed a UTI . . . supports the proposition that penile-vaginal sex occurred with the Defendant."  CP at 137-38.  The trial court agreed that the prosecutor's conduct was proper and denied Rudolph's motion.  In doing so, it concluded that the State did not violate pretrial evidentiary rulings or commit misconduct during closing.  The trial court alternatively concluded that even if there were misconduct, the impropriety would not warrant a new trial because it would be "cumulative to DNA evidence properly admitted."  CP at 209.

III. SENTENCING

In June 2016, the trial court sentenced Rudolph. Before sentencing, the trial court "reviewed . . . carefully" a presentencing report, which included information that Rudolph had prior "Domestic Violence Court Ordered Violations" and had completed anger management treatment pursuant to a domestic violence charge. 5 RP at 913; CP at 127. The report noted that Rudolph and AS had been friends for a year and had class together and that Rudolph provided AS with alcohol. The report also discussed Rudolph's financial situation: Rudolph, who was 21 at the time of sentencing, had an unknown amount of debt from attending community college. However, according to Rudolph, he knew how to manage his finances, including paying his bills and saving money. He said he was always employed, with his longest employment two years when he worked at both Target and McDonalds. Rudolph did not have a general equivalency diploma (GED) or high school degree and had not completed more than one semester of college.

The trial court sentenced Rudolph to 88 months in confinement. Related to LFOs, the trial court found that Rudolph was "presently indigent but is anticipated to be able to pay financial obligations in the future" and imposed LFOs. CP at 158. The trial court also required Rudolph to obtain domestic violence and sexual deviancy evaluations and to complete any recommended treatment as community custody conditions.

Rudolph appeals his conviction and sentence.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Rudolph contends that the evidence was not sufficient to support his conviction of second degree rape. We disagree.

Evidence is sufficient to support a guilty verdict if "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Reasonable inferences must be drawn in the State's favor, and the defendant "admits the truth of the State's evidence." *Salinas*, 119 Wn.2d at 201. We do not review credibility determinations, which are for the trier of fact. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

"A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree,[4] the person engages in sexual intercourse with another person: . . . [w]hen the victim is incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(b). "Sexual intercourse" "has its ordinary meaning and occurs upon any penetration, however slight." RCW 9A.44.010(1)(a). A person is "physically helpless" if she "is unconscious or for any other reason is physically unable to communicate unwillingness to an act." RCW 9A.44.010(5).

First, Rudolph argues that AS "could not remember what happened"; but contrary to Rudolph's argument, AS recalled the rape in detail at trial. Br. of Appellant at 14. AS testified

---

[4] First degree rape occurs when a person engages in sexual intercourse with another "by forcible compulsion" and by either using or threatening to use what is or appears to be a deadly weapon, kidnapping the victim, inflicting serious physical injury, or feloniously entering into a building or vehicle where the victim is situated. RCW 9A.44.040(1).

that she awoke in Rudolph's bed to Rudolph "having sex with [her]," including penetration. 1 RP at 90. She was "too drunk to move or scream" or do anything. 1 RP at 90. AS testified, "I could control my breathing and I remember holding my breath hoping that he would notice and stop. And he noticed that I stopped breathing and he checked my pulse, and he flipped me over and continued having sex with me." 1 RP at 98-99. This testimony, which is taken as true, *see Salinas*, 119 Wn.2d at 201, establishes both sexual intercourse and physical helplessness because AS described both penetrative intercourse and that she was physically unable to manifest her unwillingness to the act. *See* RCW 9A.44.050(1)(b), .010(1)(a), (5).

Next, Rudolph argues that the evidence is not sufficient under *State v. Chapin*, 118 Wn.2d 681, 826 P.2d 194 (1992). There, the Supreme Court held that the alleged victim's statement, "'Raped me,'" had to be excluded and that the remaining evidence was not sufficient to convict the defendant, one of the alleged victim's caretakers, of second degree rape. *Chapin*, 118 Wn.2d at 683-84, 692. The remaining evidence was that the defendant asked another caretaker to trade patients with him and that the alleged victim became extremely hostile toward the defendant and exhibited symptoms that could have been from rape. *Chapin*, 118 Wn.2d at 692. The Supreme Court noted that the evidence was "speculative and does not establish that a rape occurred, or that if there was a rape [the defendant] was the rapist." *Chapin*, 118 Wn.2d at 692.

Unlike in *Chapin*, here the victim took the stand and recounted the details of the rape, including identifying Rudolph as her attacker. The testimony establishes the elements of second degree rape without resort to speculation. Accordingly, *Chapin* is distinguishable.

Finally, Rudolph relies on evidence that he suggests casts doubt on AS's credibility, namely that AS was not injured, initially stated that she did not remember the perpetrator's identity,

9

and acted calmly and quietly and went to a fundraiser on the day following the incident. Rudolph overlooks that in reviewing challenges to the sufficiency of the evidence, we do not review credibility determinations, which are within the province of the finder of fact. *See Camarillo*, 115 Wn.2d at 71. We reject Rudolph's arguments and hold that the evidence is sufficient to support Rudolph's conviction.[5]

## II. REASONABLE DOUBT JURY INSTRUCTION

Rudolph also contends that the jury instruction, based upon WPIC 4.01, that "[a] reasonable doubt is one for which a reason exists" improperly relieved the State of its burden to prove every element of the offense beyond a reasonable doubt and accordingly violated due process and the Sixth Amendment. CP at 64. We disagree.

The Supreme Court has directed our trial courts to instruct the jury pursuant to WPIC 4.01. *State v. Bennett*, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007). This instruction was again deemed proper and correct in *State v. Kalebaugh*, 183 Wn.2d 578, 584-86, 355 P.3d 253 (2015). And in *State v. Parnel*, we rejected an argument that the language in WPIC 4.01 to which Rudolph objects undermines the presumption of innocence by requiring the jury to articulate a reason for a reasonable doubt. 195 Wn. App. 325, 327, 381 P.3d 128, *review denied*, 186 Wn.2d 1031 (2016). Thus, Rudolph's argument fails.

## III. PROSECUTORIAL MISCONDUCT AND MOTION FOR A NEW TRIAL

Rudolph argues that he was denied his right to a fair trial when the prosecutor committed prosecutorial misconduct by arguing facts not in evidence, allegedly arguing that AS was "raped

---

[5] For these reasons, Rudolph's SAG sufficiency of the evidence argument also fails.

as a virgin." Br. of Appellant at 24. Rudolph also argues that the trial court abused its discretion when it denied his CrR 7.5(a)(2) motion for a new trial, in which Rudolph argued that there had been prosecutorial misconduct. Rudolph's arguments fail.

## A. LEGAL PRINCIPLES

A trial court may grant a motion for a new trial under CrR 7.5 where there has been "[m]isconduct of the prosecution or jury." CrR 7.5(a)(2). In deciding a CrR 7.5(a)(2) motion based upon alleged prosecutorial misconduct, "the trial court applies the same standard as an appellate court reviewing such claims." *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). That is, the trial court determines whether the defendant has met his burden to show that the prosecutor's comments were improper and prejudicial. *McKenzie*, 157 Wn.2d at 52. We review the trial court's determination for an abuse of discretion. *See McKenzie*, 157 Wn.2d at 51, 57.

To prevail on a claim of prosecutorial misconduct, a defendant must show that "the prosecutor's conduct was both improper and prejudicial in the context of the entire trial." *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976, *cert. denied*, 135 S. Ct. 2844 (2015). If a defendant did not object, he waives error unless "the misconduct was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

## B. EVEN IF IMPROPER, NO PREJUDICE

At the outset, we note that the record controverts Rudolph's characterization that in closing, the State argued that AS was a virgin. The prosecutor never said the word "virgin" in closing. Rather, without Rudolph's objection, the prosecutor argued,

> She got a urinary tract infection, and it's true, there's more than one way that can be caused, but we heard from Dr. Wilmington *that it is very common after a first sexual experience, penile-vaginal sex that is,* that girls will develop a UTI, and that she started having that pain and started telling others about it almost immediately right afterwards, after that night. That again corroborates that she had sex that night.

4 RP at 797 (emphasis added). This argument relied upon Dr. Wilmington's testimony that a woman is likely to contract a UTI following her first sexual intercourse and at most *implied* that AS was a virgin.

Bearing in mind that the prosecutor's argument at most implied AS's virginity, we assume without deciding that this implication was improper. We focus upon whether the alleged error met the heightened prejudice standard for unobjected-to prosecutorial misconduct: whether it "was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704.

At trial, Rudolph was able to alleviate any prejudice that resulted from the prosecutor's implication that AS was a virgin when she was raped. In his closing argument, Rudolph attacked the prosecutor's argument and told the jury that he was "concerned" about the prosecutor's implication that the rape had been AS's "first sexual experience." 5 RP at 836. He pointed out the testimony of AS's mother that AS had been sexually active with her ex-girlfriend and the third-person DNA in AS's underwear, which was "circumstantial evidence that she'd had sex with another male." 5 RP at 837. And he reminded the jury that "there were other ways you can get a UTI" than sexual activity, according to Dr. Wilmington's testimony. 5 RP at 836.

These circumstances fall short of the flagrant and ill-intentioned prejudice required to merit reversal. In *Glasmann*, for example, the Supreme Court reversed a defendant's convictions on the basis of prosecutorial misconduct during closing argument that included the use of highly

inflammatory images to "appeal to passion and prejudice on all counts." 175 Wn.2d at 712. There, the use of the images "contaminated the entire proceedings" in such a manner as to create a "substantial likelihood . . . that the jury returned guilty verdicts for the offenses . . . because they were influenced by the prosecutor's improper closing argument and the altered 'evidence' presented." *Glasmann*, 175 Wn.2d at 712.

Here, in contrast, the alleged misconduct consisted of a single statement during the prosecutor's closing argument that restated the testimony of one of the State's witnesses. Any prejudice resulting from this statement was dispelled when Rudolph drew the jury's attention to three separate facts that rebutted the prosecutor's implication. Accordingly, we hold that even assuming without deciding that the prosecutor's implication that AS was a virgin was improper, Rudolph cannot show that the alleged misconduct "was so flagrant and ill intentioned that an instruction would not have cured the prejudice." *Glasmann*, 175 Wn.2d at 704.

IV. DOMESTIC VIOLENCE EVALUATION COMMUNITY CUSTODY CONDITION

Rudolph argues that the trial court exceeded its statutory authority and accordingly erred when it imposed a requirement that Rudolph obtain a domestic violence evaluation as a condition of his community custody. Rudolph makes two arguments: (1) there are no facts showing that the crime involved domestic violence and, alternatively, (2) a crime must be charged as a domestic violence crime in order to impose domestic violence treatment. The State responds that the trial court was within its discretion to impose this condition in light of a presentencing investigation that recommended domestic violence treatment. We agree with Rudolph's argument that there are

13

no facts that the crime involved domestic violence and accordingly hold that the trial court abused its discretion.[6]

## A. LEGAL PRINCIPLES

We review for an abuse of discretion the imposition of crime-related prohibitions as authorized by the Sentencing Reform Act of 1981 (SRA), ch. 9.94A RCW, although we review de novo whether the SRA grants authority to impose a certain condition. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "Discretion is abused when it is exercised on untenable grounds or for untenable reasons." *State v. Clark*, 191 Wn. App. 369, 372, 362 P.3d 309 (2015).

"As a part of any sentence, the court may impose and enforce crime-related prohibitions and affirmative conditions as provided in" ch. 9.94A RCW. Former RCW 9.94A.505(8) (2010). The SRA vests a sentencing court with discretion to order an offender to "[p]articipate in crime-related treatment or counseling services" or "[p]articipate in rehabilitative programs or otherwise perform affirmative conduct reasonably related to the circumstances of the offense, the offender's risk of reoffending, or the safety of the community." RCW 9.94A.703(3)(c), (d). When interpreting these subsections, we have held that a treatment requirement imposed under either RCW 9.94A.703(c) or (d) must concern behavior that was also involved in the offense. *See State v. Jones*, 118 Wn. App. 199, 207-08, 76 P.3d 258 (2003) (discussing former RCW 9.94A.120(11)(b) (1999) and former RCW 9.94A.700(5)(c) (2001), predecessors to RCW 9.94A.703(3)(c) and (d)).

---

[6] Because we agree that the crime did not involve domestic violence and hold that the trial court abused its discretion, we do not reach Rudolph's alternative argument that the crime had to be charged as a domestic violence crime to impose domestic violence treatment.

As used throughout the SRA and in another subsection of the community custody conditions statute, RCW 9.94A.703(4)(a), "[d]omestic violence" means offenses perpetrated against a family or household member. RCW 9.94A.030(20); RCW 10.99.020(5)(t). A family or household member includes a blood relative, a spouse, those who have a child in common, cohabitants, or a person with whom the perpetrator had a "dating relationship"—a "social relationship of a romantic nature." RCW 10.99.020(3), .020(4) (citing RCW 26.50.010).

## B. ANALYSIS

As Rudolph points out, the trial testimony was that AS and Rudolph's relationship was platonic. AS explained that Rudolph knew that she was lesbian and that she had repeatedly rejected Rudolph when he "'hit on'" her. 1 RP at 95. AS testified that before the incident, she and Rudolph were "good friends" who spent time together every day, but she never testified that they had dated or lived together. 1 RP at 78.

The State points to evidence that Rudolph and AS said they loved each other and slept in the same bed "on numerous occasions." Br. of Resp't at 22. But the State's arguments mischaracterize the evidence. AS explained that when she said that she "loved" Rudolph, she meant it "as a friend." 1 RP at 122. And contrary to the State's argument, AS said she had spent only one other night at Rudolph's home, when she and her then-girlfriend slept in his bed.

The State also relies upon the presentencing report, which included that Rudolph had "two Domestic Violence Court Ordered Violations" and had completed "[a]nger management as a requirement for a previous Domestic Violence charge." CP at 127, 129. However, the report contained no information connecting these prior domestic violence incidents to AS. And like the trial testimony, the facts in the presentencing report were that AS and Rudolph's relationship was

not romantic: they had been friends for approximately a year, had a class together, and AS relied on Rudolph as a source of alcohol.

Neither the evidence nor the presentencing report support that the crime involved domestic violence because neither source provides facts showing that AS was in a dating relationship with Rudolph. *See* RCW 9.94A.030(20); RCW 10.99.020(3), (5)(t). Accordingly, there was no tenable reason for the trial court to conclude that the crime involved domestic violence and to require that Rudolph obtain a domestic violence evaluation. *See Jones*, 118 Wn. App. at 208. We hold that the trial court abused its discretion when it imposed the condition and remand for the condition to be stricken from Rudolph's judgment and sentence.

## V. Legal Financial Obligations

Rudolph argues that the trial court erred when it imposed LFOs because it did so without inquiring into Rudolph's present ability to pay. The State responds that this court should decline to reach the issue because it is first raised on appeal[7] and, alternatively, that the trial court's reliance upon the presentencing report was sufficient. We agree with Rudolph and hold that the trial court's reliance on the presentencing report was insufficient.

We have held that "'when the presentence report establishes a factual basis for the defendant's future ability to pay and the defendant does not object, the requirement of inquiry into the ability to pay is satisfied.'" *State v. Lundy*, 176 Wn. App. 96, 106, 308 P.3d 755 (2013) (quoting *State v. Baldwin*, 63 Wn. App. 303, 311, 818 P.2d 1116, 837 P.2d 646 (1991)).

---

[7] Following *State v. Blazina*, we exercise our discretion to reach LFO issues first raised on appeal. 182 Wn.2d 827, 830, 835, 344 P.3d 680 (2015).

However, in *State v. Blazina*, our Supreme Court emphasized the importance of an on-the-record individualized inquiry into a defendant's ability to pay. *See* 182 Wn.2d 827, 838, 344 P.3d 680 (2015). The court stated that "[t]he record must reflect that the trial court made an individualized inquiry" and that the trial court "must . . . consider important factors . . . such as incarceration and a defendant's other debts, including restitution" when making this determination. *Blazina*, 182 Wn.2d at 838.

Here, the trial court stated that it had "reviewed . . . carefully" the presentencing report. 5 RP at 913. That report found that Rudolph, who was then 21, had some school debt from a semester at community college. Otherwise, Rudolph represented himself as knowing "how to manage his money," including paying his bills and saving for his daughter. CP at 128. Rudolph was "always" employed, with his longest employment two years that he worked simultaneously for Target and McDonalds. Rudolph had neither a GED nor high school degree. When the trial court imposed LFOs, it did not directly ask Rudolph about his ability to pay.

The trial court imposed approximately $5,400 in discretionary LFOs—a $250 jury demand fee, a $2,250 court-appointed attorney fee, and a $2,902 court-appointed expert fee.[8] *See Lundy*, 176 Wn. App. at 107 (jury demand fee is discretionary); *In re Pers. Restraint of Dove*, 196 Wn. App. 148, 155, 381 P.3d 1280 (2016) (court-appointed attorney fees and defense costs are discretionary), *review denied*, 188 Wn.2d 1008 (2017).

---

[8] Contrary to Rudolph's arguments, the $200 filing fee was not discretionary. *See* former RCW 36.18.020(2)(h) (2012) (clerks "shall collect" a $200 filing fee). Rudolph's judgment and sentence imposes a $200 filing fee, $500 victim assessment, $100 crime lab fee, and $100 DNA collection fee.

The State argues that under *Lundy*, the trial court's reliance on the presentencing report was sufficient. *See* 176 Wn. App. at 106. However, *Blazina* calls into question a rule that a trial court's reliance on a presentencing report can substitute for an individualized inquiry. *See* 182 Wn.2d at 838. In light of *Blazina*, we decline to follow *Lundy* in this respect, and we hold that the trial court's review of the presentence investigation was not a sufficient on-the-record individualized inquiry. We also conclude that the trial court here failed to perform the individualized inquiry required under *Blazina*. Accordingly, we remand for the superior court to reconsider whether to impose discretionary LFOs.

## VI. STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

### A. DENIAL OF CONTINUANCE MOTION

Rudolph argues that the trial court abused its discretion when it denied Rudolph's request for a continuance. Rudolph claims a continuance would have allowed for further testing that would have revealed the identity of the unknown third DNA contributor and clarified whom the "DNA or 2 sperms cells" belonged to. SAG at 2. We disagree that the trial court abused its discretion.

We review the denial of a continuance for an abuse of discretion; we do not disturb the trial court's decision unless it is clear that the decision was manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *State v. Downing*, 151 Wn.2d 265, 272, 87 P.3d 1169 (2004). Factors that may be considered include diligence, redundancy, due process, materiality, and maintenance of orderly procedure. *Downing*, 151 Wn.2d at 273.

Four days before Rudolph's jury trial, he requested a continuance in order to retest AS's underwear for DNA evidence. The trial court denied the motion. On the morning of trial, when Rudolph renewed his motion, the State objected that Rudolph had known he might want a DNA

expert for at least four months. The trial court explained that it would not grant a continuance because the trial date had already been moved five times, from January 2015 to March 2016.

Under these facts, the trial court did not abuse its discretion. Rather, the trial court properly considered the case's age under the factor of maintenance of orderly procedure. *See Downing*, 151 Wn.2d at 273. The record also supports that Rudolph's attorney, who had represented Rudolph on the case for nearly a year, did not act diligently in bringing the motion. *See Downing*, 151 Wn.2d at 273. We hold that the trial court was within its discretion to deny the continuance.

### B. EVIDENTIARY ERROR

Rudolph appears to argue that the trial court abused its discretion when it allowed the State to delete the exchange about AS's former girlfriend and then use the text message conversation between Rudolph and AS as trial evidence.[9] We hold that the doctrine of invited error precludes our review.

Under the doctrine of invited error, a party cannot set up an error at trial and then complain of the error on appeal. *In re Pers. Restraint of Breedlove*, 138 Wn.2d 298, 312, 979 P.2d 417 (1999). Here, before trial and without Rudolph's objection, the trial court allowed the State to delete a text message exchange referring to AS's ex-girlfriend from the conversation between AS and Rudolph after the incident. During trial, when the prosecutor moved to admit the exchange,

---

[9] It is unclear whether Rudolph is also arguing that the conversation was otherwise incomplete or that the deletions portrayed Rudolph unfairly. We decline to reach any other arguments advanced about the text messages because the exhibit containing screenshots of the conversation was not designated as a part of our record. Although the record provides enough detail to show that Rudolph invited any error related to the exclusion of the exchange, a review of the text messages would be necessary to address any other arguments.

Rudolph objected. The trial court denied the prosecutor's motion, and the exchange was never admitted.

Rudolph appears to argue that he was prejudiced because he could have used the never-admitted text exchange to argue that AS had a motive to fabricate allegations against him. However, because Rudolph objected to the exchange's admission at trial, we hold that he invited the alleged error. *See Breedlove*, 138 Wn.2d at 312. Accordingly, he may not complain of the alleged error on appeal.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Rudolph asserts that his counsel rendered ineffective assistance because his counsel should have objected to "the chain of custody of the underwear" and argued that Rudolph's DNA could have been transferred from his "coat." SAG at 3. Rudolph also asserts that the record reveals that his attorney was unprepared and failed to call necessary witnesses. We disagree.

We review de novo claims of ineffective assistance of counsel, which present mixed questions of law and fact. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prevail, the defendant must show that his attorney's performance was deficient and that the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is that which falls below an objective standard of reasonableness. *Sutherby*, 165 Wn.2d at 883. Prejudice is a reasonable probability that but for the deficient performance, the result of the proceeding would have differed. *Strickland*, 466 U.S. at 694. If either element of the test is not met, the defendant's ineffective assistance of counsel claim fails and the inquiry ends. *Strickland*, 466 U.S. at 697.

1.     CHAIN OF CUSTODY AND FAILURE TO ARGUE TRANSFER OF DNA

"Before a physical object connected with . . . a crime may properly be admitted into evidence, it must be satisfactorily identified and shown to be in substantially the same condition as when the crime was committed." *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984).

AS gave police the clothes she was wearing on the night she was raped, including her underwear and a sweatshirt that she had borrowed from Rudolph. At trial, Officer Jensen, who collected the clothes, identified the underwear, which he had packaged and sealed with evidence tape. He believed that the sweatshirt had been packaged separately from the other clothes and had "probably just never touched" them. 2 RP at 263. Regarding the underwear's chain of custody, the State introduced evidence that after Officer Jensen sealed the underwear, the next time it was accessed was by forensic scientist Kelly to take DNA samples.

The State's evidence included identification of the underwear and Officer Jensen's testimony that it was in the same condition as when he packaged it. Given this evidence, the State established chain of custody of the underwear, and any objection would have been futile. *See Campbell*, 103 Wn.2d at 21. Accordingly, Rudolph fails to show that his attorney's failure to object to the underwear's admission on chain-of-custody grounds fell below an objective standard of reasonableness, and his related ineffective assistance of counsel claim lacks merit. *See Sutherby*, 165 Wn.2d at 883; *Strickland*, 466 U.S. at 697.

Rudolph's DNA was found on the interior crotch of AS's underwear, and Rudolph appears to argue that his attorney should have made more of the fact that his DNA could have transferred to the underwear from his sweatshirt. When she cross-examined Officer Jensen, Rudolph's attorney questioned Jensen about whether the sweatshirt had possibly touched AS's underwear in

the 10 days that the items were kept in AS's room. Rudolph's attorney elicited testimony from Officer Jensen that he had no way of knowing if the items were intermingled before he received them. And in closing, Rudolph's attorney capitalized on this testimony by arguing that AS's underwear could easily have been intermingled with other items containing Rudolph's DNA.

Because Rudolph's attorney elicited and used testimony that showed that the DNA could have been transferred to AS's underwear, Rudolph cannot show that his attorney's performance was objectively unreasonable. *Sutherby*, 165 Wn.2d at 883. Accordingly, his related ineffective assistance of counsel claim fails. *See Strickland*, 466 U.S. at 697.

2.     PREPARATION FOR TRIAL

Rudolph claims that his attorney assumed she would obtain a continuance and therefore was unprepared for trial and had not subpoenaed necessary defense witnesses. Rudolph also claims that his attorney refused to call "2 sisters who were important to" his case. SAG at 4. The record contains no evidence that Rudolph was unable to present necessary witnesses or that his attorney was otherwise unprepared. Because the matters to which Rudolph refers necessarily rest on alleged evidence outside the record, we decline to review these issues. *See State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

D.  PROSECUTORIAL MISCONDUCT

Rudolph asserts that the prosecution improperly used Hale's testimony that AS drank "[l]ike 3/4 of a bottle" of vodka as expert witness testimony to show that AS was "blackout drunk." 3 RP at 417; SAG at 2. We disagree.

In closing, a prosecutor "has wide latitude to argue reasonable inferences from the evidence." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). Here, the evidence

included Hale's testimony that he observed AS consume approximately three-quarters of "a fifth" of vodka. 3 RP at 417. Hale stated AS was "drunk" and that Rudolph helped her walk, but he did not express an opinion about "how drunk" AS was. 3 RP at 443. In closing, the prosecutor relied upon this testimony to argue that "it makes complete sense that [AS] was blacking out and passing out later unconscious" based upon how much alcohol AS had consumed. 4 RP at 794.

Contrary to Rudolph's arguments, the prosecutor's closing argument did not rely on Hale's testimony as "expert" testimony that AS was "blackout drunk." SAG at 2. Rather, the prosecutor properly relied upon the reasonable inference from Hale's testimony that a person who consumes a large amount of vodka is likely to be "blacking out and passing out later." 4 RP at 794; *see Thorgerson*, 172 Wn.2d at 448. Because the prosecutor's argument was proper and did not treat Hale's testimony as expert testimony, Rudolph's argument fails.

E. MATTERS OUTSIDE THE RECORD

Rudolph refers to several matters depending on alleged evidence outside the record on review. We do not review matters that depend on evidence outside the record. *See McFarland*, 127 Wn.2d at 335.

First, Rudolph asserts that a juror stated she was close friends with one of the prosecuting witnesses and asked the witness if he knew Rudolph. Rudolph also alleges that the juror's son spoke to "Dalvin Hail [sic]" about the case. SAG at 1. The only reference to this in the record is from the hearing on Rudolph's new trial motion. Rudolph told the trial court that he was concerned "during the trial there was a witness who may have been texting somebody else who, who was associated with the case, and one of the jurors also knew one of the witnesses." RP (July 27, 2016) at 20-21. The trial court declined to hear further argument on the subject, which had not been

23

properly briefed and presented. Any evidence supporting Rudolph's argument is outside our record, so that this issue cannot be reviewed.

Second, Rudolph claims his trial was not fair because it occurred a week before spring break and because he believes jurors convicted him in order to go on vacation. Rudolph's trial occurred the week of March 28, 2016. But any evidence about the timing of spring break or whether jurors had vacations or flights that would have been impacted by a longer trial is outside our record.

Third, Rudolph asserts that his attorney prevented him from testifying. Rudolph waived his right to testify in his defense on the record, after a colloquy with the trial court. At no point in the record did Rudolph state that he had been prevented from testifying. Rudolph provides nothing more than his bare assertion that his attorney would not allow him to testify, and we accordingly do not review this claim, which rests upon alleged evidence outside the record.

Fourth, Rudolph claims that several jurors were biased against him. Voir dire was not transcribed, so that these matters are, again, outside the record.

## VII. APPELLATE COSTS AND CONCLUSION

Rudolph requests, and the State concedes, that appellate costs should not be imposed should the State substantially prevail. We accept the State's concession.

We affirm Rudolph's conviction but remand to the trial court to strike the domestic violence evaluation and treatment community custody condition and to reconsider whether to

No. 49126-5-II

impose discretionary LFOs after conducting an individualized inquiry into Rudolph's ability to pay.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

I concur:

MELNICK, J.

25

MAXA, A.C.J. (concurring) – Under *State v. Blazina,* this court had discretion to consider Rudolph's argument that the trial court erred in imposing legal financial obligations (LFOs) without conducting an individualized inquiry into Rudolph's ability to pay them. 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). Here, we decided to exercise that discretion and address Rudolph's argument. I write separately because I believe that we generally should decline to consider LFO arguments raised for the first time on appeal when sentencing occurred after the Supreme Court decided *Blazina* in March 2015.

Appellate courts generally do not consider issues raised for the first time on appeal. *State v. Gentry*, 183 Wn.2d 749, 760, 356 P.3d 714 (2015). However, after *Blazina* the Supreme Court repeatedly exercised its discretion to consider unpreserved arguments that the trial court erred in imposing discretionary LFOs without considering the defendant's ability to pay. *E.g., State v. Lee,* 188 Wn.2d 473, 501-02, 396 P.3d 316 (2017); *State v. Marks,* 185 Wn.2d 143, 145-46, 368 P.3d 485 (2016). Taking the Supreme Court's lead, this court began regularly exercising our discretion to consider unpreserved LFO arguments.

However, in all of the Supreme Court cases cited above and in most of the cases in this court considering unpreserved LFO arguments, the sentencing hearings had taken place before the Supreme Court issued the *Blazina* decision. Before the Supreme Court clarified the law in *Blazina*, it was more understandable that defense counsel would fail to object when the trial court did not assess the defendant's ability to pay before imposing discretionary LFOs. By contrast, Rudolph was sentenced in June 2016, more than a year after *Blazina* was decided. By that time, the rule confirmed in *Blazina* had been discussed extensively in appellate decisions and in other forums. As a result, it is improbable that defense counsel here was unaware that the

26

trial court had an obligation to assess Rudolph's ability to pay before imposing discretionary LFOs.

The law now is extremely clear that the trial court must make an individualized inquiry into a defendant's ability to pay before imposing discretionary LFOs. *Blazina*, 182 Wn.2d at 837-38. If the trial court fails to make this inquiry, defense counsel now know or should know to object if they want to preserve this issue for appeal. As a result, I believe that we should return to our traditional rule of declining to consider LFO arguments that were not raised in the trial court.

_____
MAXA, A.C.J.