# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59071-9-II |
| Respondent, | |
| v. | |
| JEROME CAESAR ALVERTO, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — Jerome Caesar Alverto was convicted of attempted murder in the first degree, burglary in the first degree, and robbery in the first degree. He appeals the trial court's denial of his motion for post-conviction deoxyribonucleic acid (DNA) testing of blood found on his pants and a hair found at the crime scene. He argues the court erred because the results of this DNA testing in conjunction with other new evidence would show his innocence on a more probable than not basis. Because favorable results from the DNA testing would not show his innocence on a more probable than not basis, we affirm.

FACTS

I.      BACKGROUND[1]

Alverto and Stephanie Wilson dated for two and a half years before getting married in 2005. They were married for only 40 days before they separated.

---

[1] This factual account is taken from testimony elicited at trial.

On May 12, 2006, Wilson went out with her boyfriend, Eric Rogers, to play pool and darts. That night, instead of staying with Rogers as she usually did every weekend, she went home to her house.

Wilson got home around 2:00 to 3:00 a.m., got undressed, and got in bed. She dozed off and was awoken by a call from an unknown number that turned out to be Alverto. Alverto asked her about her concealed weapons permit and if she was going to marry Rogers. Alverto told her she should not have married Alverto and that she was going to be sorry.

Wilson hung up and texted Rogers telling him about the phone call. Rogers called Wilson and said he was going to come to her house, but she told him not to. After she got off the phone with Rogers, she turned on the security alarm to her house.

Wilson went to the bathroom to wash her hands but the water would not turn on. As she turned around, she was attacked from behind and hit over the head with a wine bottle. Wilson fell to the ground, and her attacker struck her repeatedly over the head with a handgun. The attacker, who Wilson identified as Alverto, wore dark clothes and a bandana over his face leaving his eyes and nose exposed, and repeatedly told Wilson she should not have married him. Wilson recognized Alverto as the attacker by his eyes, body, and voice. Wilson asked Alverto about his daughter by name and he responded, "Shut up. Shut up." Rep. of Proc. (RP) (Aug. 6, 2008) at 350.

Alverto told Wilson to get dressed, and as she went to the closet to get clothes, he picked up the safe that contained the wedding ring he had given her. As he was looking at the safe, Wilson ran down the stairs to try to escape. Alverto caught her at the bottom of the stairs and hit her repeatedly with the gun. Wilson lunged at him and tried to scratch him to get DNA evidence underneath her fingernails.

Wilson ran out the front door and screamed for help. She ran to the side of her neighbor's house, and Alverto shot her in the chest. Wilson fell to the ground, and Alverto shot her through her hand.

Wilson pretended to be dead so Alverto would leave and then ran to the back of her neighbor's house and banged on the door yelling for help. Alverto came back and shot her in the back of the neck. He dragged Wilson by her hair down the neighbor's steps out into the middle of the yard. Alverto then shot her two more times in the head.

Wilson pretended to be dead again, and then made her way to the neighbor's house. The neighbor told her he called 911, and Wilson said "let them know that Jerome Caesar Alverto did this; that he lives at 17311 85th Avenue Court East, Puyallup. He drives a green Volvo[] and . . . a champagne Mercedes." RP (Aug. 6, 2008) at 273.

Police and paramedics arrived, and Wilson told police that Alverto was her attacker. Wilson was taken to the hospital to be treated for her injuries. Hospital staff were asked to conduct fingernail scrapings on Wilson, but this never occurred.

When they arrived at Wilson's house, police encountered Rogers, and he was briefly questioned and then released.

Officers were sent to Alverto's residence. On the way, deputies Mark Fry and Bryan Cline stopped Alverto approximately 400 yards from his house driving a tan Mercedes. Alverto was arrested and searched. As Fry searched Alverto, he noticed blood on both of Alverto's pants legs. Inside Alverto's vehicle, officers discovered black cloth gloves and a Smith & Wesson gun case with .40 and .22 caliber ammunition.

Officers also found a notebook in the vehicle that contained a "to-do list" for how to attack and murder someone. RP (Aug. 13, 2008) at 788. The document listed tools including "[g]un,

3

taser, knife, handcuffs, tape, shoe covers, gloves, flashlight, scarf or face mask. . . [s]tranger hair[/] condom." RP (Aug. 13, 2008) at 789. It also listed a dress code including "[d]ark pants, dark shirt, gloves, stocking cap and face mask." RP (Aug. 13, 2008) at 789. Then, it specified how to carry out the act by stating, "No communication. Enter garage 5 a.m. Wait until . . . anyone answers. Taser individual. Handcuff right arm to left leg . . . Tape arms and tape legs together. Added restraint." RP (Aug. 13, 2008) at 789. On the final page titled "Options" it said, "Set her on fire. Act out a . . . car jacking gone bad. . . . Taser [–] stab her in the garage and smear blood in the garage." RP (Aug. 13, 2008) at 789-90.

Later that morning, officers received a call about a black duffel bag found at a construction site. The bag was sitting on top of a bundle of lumber and was visible from the street. It contained a loaded Smith & Wesson .40 caliber automatic handgun, a black leather jacket, a backpack, a cell phone that belonged to Wilson, two sets of handcuffs, gas masks, a blue bandana, respiratory masks, trash bags, clothes, a blue stocking cap, a knit mask with the eyes and mouth cut out, and a garage door opener that operated Wilson's garage.[2] There was a grocery list inside the pocket of a pair of pants in the bag that had Alverto's name on it. The bag also contained two bracelets including a bracelet that Wilson had given Alverto and a photograph of Rogers that was in Wilson's bedroom on the day of the attack.

Officers also located Wilson's locked safe in a residential garbage can 10 to 15 seconds from Wilson's house. Inside Alverto's house, officers found a loaded Smith & Wesson magazine with .40 caliber ammunition in it. RP (Aug. 11, 2008) at 574.

Alverto was charged with attempted murder in the first degree, burglary in the first degree, and robbery in the first degree, all with firearm sentencing enhancements.

---

[2] Several of the items were located inside the backpack which was located inside the duffel bag.

II.     TRIAL AND CONVICTION

At trial, Wilson testified that there was no question her attacker was Alverto.

It was him.  I mean, there's—I don't know how—how could it not be.  It was his—it was his height.  It was his body.  It was his voice.  It was him.  There's—there was just no question, no question it was him.

RP (Aug. 6, 2008) at 364.  She also testified, "I know him.  It was him, just in dark clothes and a bandanna around his face.  I mean, his eyes, I could see his eyes.  I know his body.  I know him."  RP (Aug. 6, 2008) at 254.

The State presented testimony from a DNA analyst who confirmed that the blood on Alverto's pants matched Wilson's DNA profile.  The State also presented testimony from a forensic scientist who stated that three .40 caliber cartridge casings found at the crime scene were fired from the Smith & Wesson handgun found in the duffel bag.

Forensic investigator, Steven Mell, testified that he collected a hair on the outside of the sliding glass door of Wilson's neighbor's house, but it was not tested.

The State presented the jury with evidence of the gun case, ammunition, and a "to-do" list found in Alverto's car, the ammunition found in Alverto's home, and the duffle bag and its contents.

Alverto's theory at trial was that Rogers impersonated Alverto and committed the attack.

The jury found Alverto guilty of attempted murder in the first degree, burglary in the first degree, and robbery in the first degree.  The jury also found that he was armed with a firearm at the time he committed each offense.

The trial court sentenced Alverto to 460.5 months in prison.  Alverto appealed and this court affirmed his conviction.  *State v. Alverto*, noted at 157 Wn. App. 1011 (2010).

5

III.    POST-TRIAL MOTIONS

In 2012, Alverto filed a pro se motion seeking post-conviction DNA testing of the hair found on the neighbor's door and fingernail scrapings from Wilson. He also sought "forensics testing" of the notebook found in his car, and he wanted to present phone records that would show he was not the one who called Wilson before the attack. Clerk's Papers (CP) at 58. The trial court denied this motion and a commissioner of this court affirmed that ruling.

In 2014, Alverto filed another pro se motion for post-conviction DNA testing of just the hair found on the neighbor's glass door. In conjunction with this motion, Alverto submitted an affidavit from Maurice Thrower who alleged that Rogers confessed to committing the crime. He also submitted an unsworn opinion from a handwriting expert, David Cupp, who stated that the "to-do" list found in Alverto's car was written by Rogers and not Alverto. In addition, he submitted phone records to show he was not the one who called Wilson before the attack.

In November 2014, the trial court granted Alverto's motion for testing. Eight months later, the State filed a motion for reconsideration. The court noted that the State's motion was untimely but decided to reverse its earlier ruling granting Alverto's motion. In 2017, this court affirmed the trial court's order denying Alverto' motion. *State v. Alverto*, noted at 198 Wn. App. 1006 (2017). This court stated that Thrower's affidavit was dubious and that it need not consider the handwriting analysis because it was unsworn. *Id.* at *3. The court did not address the phone records. *Id.*

In September 2023, Alverto filed the present motion for post-conviction DNA testing pursuant to RCW 10.73.170. He sought retesting of the blood located on his pants and testing of the hair found on the neighbor's glass door. He also submitted a sworn declaration from expert forensic document examiner, Robert Floberg, who concluded that there were no consistencies

6

between Alverto's handwriting and the "to-do" list and that it was "highly unlikely" he authored it. CP at 597.

Alverto argued that "prior to the 2010 Scientific Working Group on DNA Analysis Methods (SWGDAM) Guidelines and 2011 FBI Guidelines, there was no coherent set of principles and protocols that governed such testing." CP at 588. He argued that testing the blood on the pants in 2023 would "would be significantly more accurate than prior DNA testing or would provide significant new information." CP at 590. He also argued that testing the hair would "provide significant new information." CP at 591. Further, he argued that this DNA testing in conjunction with his sworn opinion from the handwriting expert "would significantly undercut the remaining identification evidence." CP at 591.

The trial court denied Alverto's motion. The court concluded that Alverto failed to meet the procedural requirements of RCW 10.73.170. Specifically, the court found that Alverto did not show why retesting the blood from his pants would provide any new information and failed to show why testing the hair on the door would be material to his innocence. The court also concluded that because the evidence presented at trial showing Alverto's guilt was so overwhelming, even favorable results from the DNA testing in conjunction with the new evidence would not show innocence on a more probable than not basis.

Alverto appeals.

## ANALYSIS

### I. COLLATERAL ESTOPPEL

As an initial matter, the State argues Alverto is collaterally estopped from raising this argument on appeal, as he already litigated this same issue in his previous motion for post-conviction DNA testing. We disagree.

A.      Legal principles

Whether collateral estoppel applies to preclude relitigation of an issue is a question of law that we review de novo. *State v. Vasquez*, 109 Wn. App. 310, 314, 34 P.3d 1255 (2001).

"The doctrine of collateral estoppel is embodied in the fifth amendment to the United States Constitution guaranty against double jeopardy." *State v. Tili*, 148 Wn.2d 350, 360, 60 P.3d 1192 (2003). Collateral estoppel means "'that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Id* (quoting *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970)). The application of collateral estoppel in criminal cases has long been recognized. *Id*. "Washington courts have adopted the perspective of federal decisions that collateral estoppel in criminal cases is not to be applied with a hypertechnical approach but with realism and rationality." *Id.* at 360-61.

The party seeking collateral estoppel bears the burden of showing all of the following:

(1) the issue in the earlier proceeding is identical to the issue in the later proceeding, (2) the earlier proceeding ended with a final judgment on the merits, (3) the party against whom collateral estoppel is asserted was a party, or in privity with a party, to the earlier proceeding, and (4) applying collateral estoppel would not be an injustice.

*Schibel v. Eymann*, 189 Wn.2d 93, 99, 399 P.3d 1129 (2017). Concerning the first element, "application of collateral estoppel is limited to situations where the issue presented in the second proceeding is identical in all respects to an issue decided in the prior proceeding, and 'where the controlling facts and applicable legal rules remain unchanged.'" *Lemond v. Dep't of Licensing*, 143 Wn. App. 797, 805, 180 P.3d 829 (2008) (internal quotation marks omitted) (quoting *Standlee v. Smith*, 83 Wn.2d 405, 408, 518 P.2d 721 (1974)). "The fourth element . . . is rooted in procedural unfairness," and we "'look to whether the parties to the earlier proceeding received a full and fair

hearing on the issue in question.'" *Eymann*, 189 Wn.2d at 102 (internal quotation marks omitted) (quoting *Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 795-96, 982 P.2d 601 (1999)).

B.      Analysis

While the second and third elements are met here, the State has not carried its burden of showing the issue in the previous motion is identical to the issue in the present motion.

In his 2014 motion for post-conviction testing, Alverto sought DNA testing of the hair found on the neighbor's door and presented evidence in the form of an affidavit alleging Rogers confessed to the crime and a non-sworn handwriting analysis stating that Alverto did not write the "to-do" list.

Conversely, in the 2023 motion, Alverto sought DNA testing of the same hair and retesting of the blood found on his pants. He also presented a sworn declaration from a different, qualified expert who opined that the handwriting of the "to-do" list was not Alverto's. Therefore, because Alverto's arguments in the 2023 motion are not substantively identical to the 2014 motion, collateral estoppel does not apply.

II.      MOTION FOR POST-CONVICTION DNA TESTING

Alverto argues the trial court erred in denying his motion for post-conviction DNA testing because favorable results in conjunction with other new evidence would show his innocence on a more probable than not basis. We disagree.

A.      Legal Principles

"RCW 10.73.170 provides a mechanism under Washington law for individuals to seek DNA testing in order to establish their innocence." *State v. Crumpton*, 181 Wn.2d 252, 258, 332 P.3d 448 (2014). Under RCW 10.73.170(1), a person currently imprisoned for a felony conviction may file a motion with the trial court requesting DNA testing. The trial court must grant a motion

if it meets certain procedural requirements[3] as well as the substantive requirement that the "convicted person has shown the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3); *see State v. Gentry*, 183 Wn.2d 749, 764, 356 P.3d 714 (2015). While the procedural requirements of RCW 10.73.170 are lenient, the substantive requirement is onerous. *State v. Riofta*, 166 Wn.2d 358, 367, 209 P.3d 467 (2009).

In determining whether the DNA evidence would demonstrate innocence, the trial court must presume that the results of the testing would be favorable to the convicted person. *Crumpton*, 181 Wn.2d at 260.

> The court should not focus on the weight or sufficiency of evidence presented at trial to decide a motion for postconviction DNA testing. It must focus on the likelihood that DNA evidence could demonstrate the individual's innocence in spite of the multitude of other evidence against them. . . .
>     At the same time, a trial court should not ignore the evidence from trial. It must look at DNA evidence in the context of all the evidence against the individual when deciding the motion.

*Id*. at 262. "The statute requires a trial court to grant a motion for postconviction testing when exculpatory results would, *in combination with the other evidence,* raise a reasonable probability the petitioner was not the perpetrator." *Riofta*, 166 Wn.2d at 367-68 (emphasis in original).

---

[3] RCW 10.73.170 provides in relevant part that,
    (2) the motion shall:
    (a) State that:
    (i) The court ruled that DNA testing did not meet acceptable scientific standards; or
    (ii) DNA testing technology was not sufficiently developed to test the DNA evidence in the case; or
    (iii) The DNA testing now requested would be significantly more accurate than prior DNA testing or would provide significant new information;
    (b) Explain why DNA evidence is material to the identity of the perpetrator of, or accomplice to, the crime, or to sentence enhancement; and
    (c) Comply with all other procedural requirements established by court rule.

"We review a trial court's decision on a motion for postconviction DNA testing for abuse of discretion." *Crumpton*, 181 Wn.2d at 257. A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. *State v. Thompson*, 173 Wn.2d 865, 870, 271 P. 3d 204 (2012).

B.      Analysis

Here, the trial court concluded that Alverto failed to meet the procedural requirements of RCW 10.73.170 because he did not show why retesting the blood from his pants "would be relevant or provide any new information" and failed to show why testing the hair on the door "would be material" to his innocence. CP at 630. The court also concluded that Alverto could not show that the DNA testing would show his innocence on a more probable than not basis because the other evidence of his guilt was overwhelming.

Even if Alverto could satisfy the procedural requirements of RCW 10.43.170, the trial court did not abuse its discretion because Alverto cannot satisfy the substantive requirement of showing that the DNA evidence would more probably than not demonstrate his innocence.

At trial, Wilson, who dated Alverto for two and half years, stated there was no question that Alverto was her attacker. She testified that she recognized him by his eyes, voice, and body, and that she "kn[e]w him." RP (Aug. 6, 2008) at 254. The State also presented evidence that the stolen safe contained the wedding ring Alverto had given Wilson, allowing an inference of a motive for taking it. The trial court was also presented with evidence that the Smith & Wesson .40 caliber firearm found in the duffel bag was the firearm used to shoot Wilson and that the ammunition found in Alverto's car and home were also .40 caliber. The empty gun case located in his vehicle was also Smith & Wesson. The State presented evidence of the notepad containing the "to-do" list for how to murder someone found in Alverto's car in addition to the grocery list

11

with his name on it in the same duffel bag as the attempted murder weapon. Alverto also called Wilson just prior to the attack and was plainly upset about her relationship with Rogers.

Because of this overwhelming evidence inculpating Alverto, a favorable DNA result on Alverto's pants and the hair, in conjunction with the handwriting expert's opinion that Alverto did not author the "to-do" list, would not demonstrate that he was more probably than not innocent. Even if the blood on the pants was not Wilson's or turned out to not be blood at all, such a favorable DNA result does not undermine any of the above described evidence presented at trial such that it exculpates Alverto to a degree that shows he is more probably than not innocent in light of the overwhelming evidence inculpating him.

Similarly, if DNA testing confirmed that the hair on the glass door was not Alverto's and was actually Rogers' or some other person's, that too would not undermine the above described evidence to a degree that shows Alverto is more probably than not innocent. Further, despite the expert's opinion that Alverto did not author the "to-do" list, authorship is immaterial to his possession of it, which remains uncontroverted.

Even favorable DNA results on both the hair and pants in the aggregate do not compel a different result, as they do not demonstrate that Alverto is more probably than not innocent in the context of the overwhelming evidence against him.

The trial court's decision to deny Alverto's motion was not manifestly unreasonable or based on untenable grounds. Therefore, the trial court did not abuse its discretion.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

We concur:

Maxa, J.

Cruser, C.J.