

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE AUG 20 2015

CHIEF JUSTICE



This opinion was filed for record
at 8:00 AM on Aug 20 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 89620-8 |
| Respondent, | |
| v. | EN BANC |
| JONATHAN L. GENTRY, | |
| Appellant. | Filed AUG 2 0 2015 |

STEPHENS, J.—In 1991, a jury convicted Jonathan Lee Gentry of the aggravated first degree murder of 12-year-old Cassie Holden and sentenced him to death. This court affirmed his conviction in 1995 on direct appeal and twice denied postconviction relief, in 1999 and in 2014. *State v. Gentry*, 125 Wn.2d 570, 888 P.2d 1105, *cert. denied*, 516 U.S. 843 (1995); *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 972 P.2d 1250 (1999); *In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 316 P.3d 1020 (2014). In 2011, Gentry filed a motion in Kitsap County Superior Court seeking postconviction DNA (deoxyribonucleic acid) testing, which the trial court granted. Among the items to be tested was a bloodstained shoelace that had been introduced into evidence at trial.

After the DNA report on the shoelace came back matching the victim's blood profile, the State moved to end further DNA testing. By that time, the judge who

granted the original motion had retired, and the case was assigned to Judge Jennifer Forbes. Gentry sent a letter to Judge Forbes indicating she may have a potential conflict of interest. During the motion hearing, Gentry asked Judge Forbes to recuse herself, observing that she had worked in the prosecutor's office during the time of Gentry's collateral appeals and that her husband had worked for the local police department during the investigation of the crime. Judge Forbes declined to recuse herself, also denying a subsequent written motion for recusal.

Judge Forbes granted the State's motion to deny further DNA testing, ruling that Gentry could not meet the substantive standard of RCW 10.73.170, which requires a convicted person to show the likelihood that DNA evidence would demonstrate innocence on a more probable than not basis. She concluded that the statute does not impose a presumption that further DNA testing will be favorable and exculpatory and held that, even with such a presumption, Gentry could not show probable innocence in light of the new inculpatory DNA test on the shoelace. Gentry timely appealed directly to this court.

We affirm the trial court. Gentry failed to preserve his argument that the trial judge should have treated his recusal request as an affidavit of prejudice. There is no reversible error in the trial judge's refusal to recuse herself. And, while the judge's conclusion that RCW 10.73.170 does not impose a favorable presumption of exculpatory DNA test results is clearly wrong in light of our recent decision in *State v. Crumpton*, 181 Wn.2d 252, 255, 332 P.3d 448 (2014), the ultimate holding denying further DNA testing is sustainable. We find that a trial court may consider new DNA

test results in deciding whether to allow further DNA testing. We hold that Judge Forbes acted within her discretion in determining that Gentry could not demonstrate probable innocence in light of the result of the DNA test on the shoelace, even assuming the remaining DNA evidence would be favorable to him.

## FACTS AND PROCEDURAL HISTORY

### 1. Background

In 1991, Gentry was convicted of first degree aggravated murder and sentenced to death for the 1988 murder of Cassie Holden in Kitsap County. This court affirmed his conviction and remanded the case for issuance of a death warrant. *Gentry*, 125 Wn.2d at 658. The key facts are summarized in this court's decision on Gentry's direct appeal:

> In early June 1988, the 12-year-old victim lived with her father and stepmother in Pocatello, Idaho. On June 11, 1988, she traveled to Kitsap County, Washington, to spend the summer with her mother at her mother's home near Bremerton. On June 13, 1988, at approximately 4:30 p.m., the young victim went for a walk. She was expected home at 6 p.m. for dinner, but never returned.
>
> Her body was found early June 15, 1988, behind a large log at the bottom of a path running from a trail through a wooded area adjacent to Rolling Hills Golf Course, near Bremerton, Washington. The victim's eyeglasses, earring and a bouquet of flowers were found approximately 148 feet up the foot path on and near the main trail.
>
> The victim appeared to have been sexually assaulted, as her jeans and underpants were pulled down and her T-shirt and bra pulled up. Her blue sweatshirt had been removed from one arm and pulled up, partially covering her face. She had been struck in the head approximately 8 to 15 times, suffering 10 "significant" injuries.
>
> Kitsap County sheriff deputies investigated the murder scene and determined that a trail of blood was splattered from the main trail, down the footpath about 148 feet to where the body was found. They found a 2.2-pound rock that had blue fibers crushed into it. The fibers matched the fibers in the victim's sweatshirt. The rock also had red spots on it that appeared to be blood. The rock was believed to be the murder weapon.

The autopsy showed that the victim had been killed by one of the blows to her head. The results of the autopsy could not show the order in which the blows were received or which blow actually killed the victim. The autopsy did not conclusively show that the young victim had been raped.

During the autopsy several loose hairs were removed from the victim's body. An examination of the hairs showed that most of them were consistent with the victim's own hairs. Two of the hair fragments were recovered from her T-shirt and were Negroid hairs. A coarse brown hair, believed to be a pubic hair from a Caucasian, was found on the victim's left thigh and a red pigmented hair was found on one of her shoes. The Negroid hair was later determined to be genetically consistent with the Defendant's brother's arm hair. Defendant's brother was not in Kitsap County at the time of the murder. Evidence was produced to show that the Defendant, who lived with his brother's family, wore his brother's clothes on occasion. There was no identification connected with the Caucasian hair.

The investigation eventually focused on the Defendant. A search of his residence was conducted and clothing samples, including a pair of shoes, were seized. Examination of the shoes indicated that blood had been wiped from the shoes. Spots of blood were found on the shoelaces and those bloodstains were the subject of a number of scientific tests. These [tests matched the blood to Holden's type; 0.18% percent of the population would have had this type of blood. . . .] [T]esting was also conducted on a hair found in the victim's T-shirt, which yielded a [blood type that] is not the same as the Defendant's type, but does match his brother's type.

. . . .

Other evidence linking Defendant to the murder included the testimony of three persons who reported seeing a man matching Defendant's description near the place of the murder and around the time of the murder, and three former jail mates of the Defendant who testified that the Defendant admitted to them he had killed someone.

*Id.* at 579-81. This court rejected two subsequent personal restraint petitions.

2. Facts Relating to Postconviction DNA Test

On February 3, 2011, Gentry filed a motion for postconviction DNA testing. Gentry argued that DNA testing has advanced since the time of his trial and now allows for more accurate testing as well as testing of items that were previously difficult or impossible to test. Gentry requested (1) comparative DNA testing of hairs found on Holden's body, T-shirt, and thigh with members of Holden's and Gentry's

families and other African-Americans and (2) testing of the blood found on Gentry's shoes and shoelaces. Gentry argued that if the DNA of one of the hairs belonged to someone other than himself or to an individual with no legitimate reason to be in close contact with Holden, there may exist a new basis to doubt his guilt. And if the DNA of the untested blood belonged to someone other than Holden, questions may exist about the evidence on which the prosecution relied.

The State did not object to Gentry's motion but reserved the right to later object to the relevance and admissibility of the results. On July 25, 2011, the court granted the motion. The court ordered about 58 items to be subject to DNA testing pursuant to RCW 10.73.170 (DNA testing requests) by the Washington State Patrol Crime Laboratory (crime lab).

On September 7, 2011, the crime lab sent the court a preliminary letter indicating its ability to perform the testing. The crime lab said it had the capacity to perform the DNA testing but indicated that the items most likely to yield probative DNA test results are those that had been previously examined during the original trial. It therefore recommended obtaining the DNA extracts held by Forensic Science Associates, run by Edward Blake. Blake declined to provide Gentry the DNA extracts for testing because he argued it was his work product. According to Gentry, the prosecutor never attempted to obtain the DNA extracts for testing despite Blake's indication that he would return them upon request by the prosecutor.

On May 18, 2012, the court granted Gentry's motion to release the left shoelace to a defense expert to conduct microscopic examinations. The expert issued a report

raising concerns about the handling of the shoelaces during their initial testing and concluding that the characteristics of the bloodstains "lack the necessary features for concluding that they were the result of blood spatter." Clerk's Papers (CP) at 573.

On July 16, 2013, the crime lab completed DNA testing of the shoelace and submitted a copy of its results to the court. The crime lab found that the DNA profile obtained from the bloodstains on the shoelace matched the DNA profile of Holden. It reported that "[t]he estimated probability of selecting an unrelated individual at random from the U.S. population with a matching profile is 1 in 110 trillion." CP at 520.

On the same day, the State filed a motion to deny further postconviction DNA testing in light of the initial DNA test results. The State argued that under *State v. Riofta*, 166 Wn.2d 358, 209 P.2d 467 (2009), postconviction DNA testing is permitted only when the "'exculpatory results would, *in combination with the other evidence,* raise a reasonable probability the petitioner was not the perpetrator.'" CP at 506 (quoting *Riofta*, 166 Wn.2d at 367-68). Thus, the State said, the "odds are 1 in 110 *trillion* that the blood on Gentry's shoe was Cassie Holden's. There is now no possibility that the State has convicted the wrong man." CP at 507. Gentry opposed the motion, arguing that numerous additional items remain untested and that the defense expert raised questions about the integrity of the handling of the shoelaces.

On October 28, 2013, the court entered a written order granting the State's motion to deny further postconviction DNA testing.

## 3. Facts Relating to Recusal Request

On July 18, 2013, the State filed a note for the motion docket setting the motion to deny further post-conviction DNA testing for a hearing on September 20, 2013. The note indicated that the matter would be set before Judge Forbes. Four days before the hearing, Gentry sent a letter to Judge Forbes, which stated, in relevant part:

> I understand that this case has recently been assigned to you for a hearing on a State's Motion now set for September 20, 2013. This is a capital case that was being actively litigated by the Kitsap County Prosecuting Attorney's Office from 1996 to 1999, a period during which I understand you were a Deputy Prosecuting Attorney in that office. I have not seen any indication that you were directly involved in the case, but it was and is a prominent one and involves claims (still pending in the courts)[1] of prosecutorial misconduct.
> Because that appears to create a conflict and obviously implicates the appearance of fairness, I felt I should alert you to this prior to filing any motion for reassignment.

Suppl. CP at 695.

At the hearing, Judge Forbes responded to Gentry's letter and declined to recuse herself:

> Well, as I indicated before, I hear a number of cases out of the prosecutor's office on a daily basis involving people that I have worked with who are the prosecutors.
> I guess if you have a little more information about who it would be that might have the finger pointed at them, I might rethink my position on that. But I don't feel that my hearing this case on that issue presents an appearance-of-fairness question.
> I also worked as a criminal defense attorney. I have handled matters as a defense attorney against this prosecutor's office. I have, you know, actively litigated cases against the prosecution. I was a member of [Washington Association of Criminal Defense Lawyers]. I have a more varied background than just being a prosecutor. And I haven't worked in the prosecutor's office since 2006. I wasn't in the criminal division since 2002, I believe. So it's been a while. And so at this point, I feel comfortable and I'm distant enough. I had no contact with this case when I was in the prosecutor's office. I think I

---

[1] Oral arguments for *In re Personal Restraint of Gentry*, 179 Wn.2d 614, were held on June 25, 2013, a few weeks before this letter was written.

saw the name on a box on a shelf, maybe at best, would be the most contact I had.

. . . .

I know nothing about this case. I don't really even know the fact pattern about this case. I had no involvement in this case when I was in the prosecutor's office. I recall no discussions about this case when I was in the prosecutor's office.

. . . .

I don't know [former trial prosecutor] Irene Asai . . . [or former prosecutor] Danny Clem. . . . I have met [former trial prosecutor Brian] Moran. I worked with him for a little while, but I never worked a case with him. He was always in a different division.

At this point, there's nothing presented that makes me concerned about my ability to proceed on this case at this time, but I'm happy to revisit that if you want to comb through your files a little bit and present information to me. If it is somebody that I knew and I feel that I have a predisposition to believe one way or another about who they are as a person and that is an issue of substance in this case, I would agree and I would remove myself from the case, but I don't have that in front of me.

Verbatim Report of Proceedings (VRP) (No. 89620-8) (Sept. 20, 2013) at 5-6, 8.

Judge Forbes also indicated that her husband was a Bremerton police officer during the time of the investigation:

He was not actively involved in this case. He worked for the Bremerton Police Department at the time. . . . [H]e indicated to me that he . . . worked as a backup to the sheriff's office on crime scene containment, wrote no reports, to his recollection, and did not testify, was not a person who was actively involved in this case. In my opinion, that doesn't create an issue for me because he was not involved and I do not believe he will be a witness in the case.

*Id.* at 6.

Judge Forbes declined to recuse herself but indicated she would reconsider her decision if Gentry provided more information. *Id.* at 9. She then proceeded to the merits of the State's motion to deny further postconviction DNA testing.

-8-

After the hearing, Gentry filed a written motion to recuse Judge Forbes. The motion did not allege any new facts regarding Judge Forbes's or her husband's participation in or knowledge of Gentry's case. Judge Forbes entered a written order denying Gentry's motion. She said, "The arguments presented in this motion are substantially similar to those made orally on September 20, 2013" and treated Gentry's motion as a motion for reconsideration. CP at 671.

Gentry timely appealed to this court.

## ANALYSIS

1. Gentry Failed To Preserve His Claim That Judge Forbes Should Have Treated His Request To Recuse as an Affidavit of Prejudice under RCW 4.12.040

A party has the right to disqualify a trial judge for prejudice, without substantiating the claim of prejudice, if the statutory requirements of RCW 4.12.050(1) are met. *State v. Chamberlin*, 161 Wn.2d 30, 41, 162 P.3d 389 (2007). RCW 4.12.040(1) states, "No judge of a superior court . . . shall sit to hear or try any action or proceeding when it shall be established . . . that said judge is prejudiced against any party or attorney." In order to establish prejudice, a party must file a motion supported by an affidavit indicating that the party "cannot" or "believes" that it cannot "have a fair and impartial trial before such judge." RCW 4.12.050(1).

Gentry argues he was entitled to a different judge upon request under RCW 4.12.040 and the court, therefore, had no discretion to deny his motion. Gentry contends that the court erred in failing to treat his letter and motion as an affidavit of prejudice, which requires automatic recusal under RCW 4.12.040(1) and .050(1).

-9-

The State counters that Gentry failed to preserve this claim of error, and we agree. At no point in the trial court did Gentry suggest he was bringing an affidavit of prejudice. Gentry did not even hint that the trial judge was *obligated* to recuse under RCW 4.12.040(1), either in his initial letter, during the hearing, or in his subsequent written motion for recusal. The general rule is that appellate courts will not consider issues raised for the first time on appeal. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). A limited exception is that a claim of error may be raised for the first time on appeal if it is a manifest error affecting a constitutional right. *Id.*; RAP 2.5(a)(3). This is not such a case. The right to peremptory removal of a judge without substantiating a claim of actual prejudice is not of constitutional dimension, but statutory, flowing from RCW 4.12.040. *See In re Welfare of McGee*, 36 Wn. App. 660, 661, 679 P.2d 933 (1984); *In re Marriage of Lemon*, 59 Wn. App. 568, 572, 799 P.2d 748 (1990), *rev'd on other grounds*, 118 Wn.2d 422, 823 P.2d 1100 (1992).

Though Gentry now faults the trial judge for not sua sponte treating his recusal request as an affidavit of prejudice, his actions in the trial court did not apprise the judge that he was seeking her removal before she made the discretionary decision before her. His recusal request was not equivalent to an affidavit of prejudice. RCW 4.12.050(1) requires a showing by motion, supported by an affidavit, that a party cannot or believes he cannot have a fair and impartial trial. While Gentry is correct that courts do not read this requirement in a hypertechnical way, the cases on which he relies involve motions that met the statute in substance. *See Garvey v. Skamser*, 69 Wash. 259, 124 P. 688 (1912) (finding sufficient an affidavit that indicated a party

believes the judge to be prejudiced); *State v. Ryncarz*, 64 Wn. App. 902, 903, 826 P.2d 1101 (1992) (finding that "form should not prevail over substance" when a clerk or judge could have easily remedied defendant's failure to notarize his affidavit of prejudice).

Gentry's recusal request, in contrast, focused on the appearance of fairness and strongly suggested the judge should recuse as a discretionary matter. *See* Suppl. CP at 695 (letter from Gentry's counsel stating, "I have not seen any indication you were directly involved in the case, but it was and is a prominent one. . . . Because that appears to create a conflict and obviously implicates the appearance of fairness, I felt I should alert you to this"); VRP (No. 89620-8) (Sept. 20, 2013) at 5 (Gentry's counsel stated during the hearing, "[I]t has nothing to do with Your Honor personally, but it does have to do, I think, with the professional association and the appearance of fairness.").

We hold that Gentry failed to preserve his claim of error that the trial judge was required to recuse under RCW 4.12.040(1).

2. The Trial Judge Did Not Abuse Her Discretion in Declining To Recuse under Code of Judicial Conduct (CJC) Canon 3.1(C)

As an alternative to his argument under RCW 4.12.040(1), Gentry argues that Judge Forbes abused her discretion. *See State v. Davis*, 175 Wn.2d 287, 308, 290 P.2d 43 (2012) (recusal decision reviewed for abuse of discretion). An abuse of discretion is found when a trial judge's decision is "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Wilson v. Horsley*, 137

-11-

Wn.2d 500, 505, 974 P.2d 316 (1999) (quoting *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

The rule for recusal is set forth in CJC Canon 3.1(C), which provides that "judges should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned." *Sherman v. State*, 128 Wn.2d 164, 188, 905 P.2d 355 (1995). In determining whether recusal is warranted, actual prejudice is not the standard. "[A] mere suspicion of partiality" may be enough to warrant recusal because "the effect on the public's confidence in our judicial system can be debilitating." *Id.* at 205. The test for determining whether a judge's impartiality might reasonably be questioned is an objective test that assumes that "'a reasonable person knows and understands all the relevant facts.'" *Id.* at 206 (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988), *cert. denied*, 490 U.S. 1102 (1989)). A separate rule describes disqualification for former government employees. CJC Canon 2.11(A)(6)(a), (b). Judges who are former government employees should disqualify themselves when they "served in governmental employment, and in such capacity participated personally and substantially as a public official concerning the proceeding." CJC Canon 2.11(A)(6)(b).

Gentry argues that the appearance of fairness doctrine requires recusal by the trial judge because she worked as a prosecutor while Gentry's collateral appeals were pending, and because her husband worked for the Bremerton Police Department during the investigation. However, the trial judge indicated she had no

involvement in the case during the trial or appellate proceedings, and she has not been employed in the criminal division of the prosecutor's office since 2002. VRP (No. 89620-8) (Sept. 20, 2013) at 6. Her husband worked as a backup to the sheriff's office during the investigation and helped contain the crime scene but wrote no reports, did not testify in the case, and is now retired from the police force. *Id.* Besides highlighting the trial judge's prior affiliation with the prosecutor's office and her husband's work, Gentry provides no further evidence to suggest that the trial judge had any involvement in the prior proceedings or interest in the outcome of the hearing. Gentry thus fails to establish a violation of the appearance of fairness doctrine or CJC Canon 3.1(C). Gentry further fails to establish that the judge had any personal or substantial involvement as a public official in the proceeding that warrants disqualification under CJC Canon 2.11(A)(6)(b).

The cases cited by Gentry involve judges who should have recused themselves because of their *direct* involvement in cases. Gentry cites no authority supporting his argument that judges should recuse themselves merely because of their associations when they had no involvement in the case. The trial judge's decision not to recuse herself was not "'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" *Wilson*, 137 Wn.2d at 505 (quoting *Carroll*, 79 Wn.2d at 26). The trial judge indicated during the hearing that she would have been happy to reconsider her decision if Gentry would have provided additional information. However, Gentry's written motion to recuse did not incorporate any new

facts that would put in question the trial judge's impartiality or appearance of impartiality. For these reasons, we hold that the trial court did not abuse its discretion in declining Gentry's request for recusal.

3. The Trial Court Erred in Concluding That RCW 10.73.170 Does Not Require a Presumption That DNA Testing Will Be Favorable to the Convicted Person

We now turn to the issues presented by the State's motion to end further postconviction DNA testing. Gentry has two main objections: one relating to the standard the trial court applied and a second objecting to the trial court's consideration of new DNA test results as a basis to cut off further DNA testing.[2]

RCW 10.73.170 allows a person convicted of a felony currently serving a term of imprisonment to file a motion requesting DNA testing. The statute includes both procedural and substantive components. The State concedes that Gentry met his procedural burden, so these requirements will not be discussed further. At issue before us is the substantive portion of the statute, which requires the convicted person to show "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3). The trial court found that Gentry

---

[2] As a preliminary matter, Gentry argues that the State's motion was essentially a motion for reconsideration, subject to Kitsap County Local Civil Rule 59 (new trial, reconsideration, and amendment of judgments). This local rule requires motions for reconsideration be filed within 10 days of entry of an order, in which case, if the rule applied here, the State's motion would be time barred. However, the State's motion was not a motion for reconsideration because it was based on the result of new DNA testing and could probably be regarded as falling under CrR 7.8(b)(2), which authorizes the trial court to relieve a party from a final order when new evidence is discovered. The State's motion was as timely as it could have been, as it was filed on the same day the crime lab released its results.

could not meet this standard and therefore was not entitled to further DNA testing. CP at 676 (Conclusion of Law V[3]).

We review a trial court's decision on a motion for postconviction DNA testing for abuse of discretion. *Riofta*, 166 Wn.2d at 370. A trial court abuses its direction if its decision rested on facts unsupported in the record or was reached by applying the wrong legal standard. *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009).

The trial court concluded Gentry "failed to show a 'reasonable probability of his innocence'" in light of the inculpatory DNA test results. CP at 676 (Conclusion of Law V (quoting RCW 10.73.170(3))). The court rejected Gentry's claim that the statute presumes further DNA testing would be favorable and exculpatory, entering the following conclusion of law:

> That any claim that the Court must presume that further DNA testing would be both favorable and exculpatory, is essentially the same argument that was put forth by the dissenting justices in *Riofta*[,166 Wn.2d at 376 (C. Johnson, J., dissenting)]. The majority opinion in *Riofta*, however, rejected this view and held that "RCW 10.73.170(3) asks a defendant to show a reasonable probability of his innocence before requiring State resources to be expended on a test."

*Id.* at 676 (Conclusion of Law VI) (quoting *Riofta*, 166 Wn.2d at 369-70).

This court recently held in *Crumpton*, 181 Wn.2d at 255, that under RCW 10.73.170(3) "a court should presume DNA evidence would be favorable to the convicted individual when determining if it is likely the evidence would prove his or her innocence." Neither of the parties discuss *Crumpton* because it was decided after

---

[3] The trial court's conclusions of law are misnumbered after the first Conclusion of Law V. The second Conclusion of Law "IV," CP at 676, should be numbered "[VI]," and the second Conclusion of Law "V" should be numbered "[VII]." This opinion will reference the conclusions of law as they should have been numbered.

they submitted their briefs. Gentry submitted a statement of additional authority in light of *Crumpton*, supporting his argument that the trial court applied the incorrect standard in granting the State's motion. The State did not submit its own statement of additional authority.

In light of this court's decision in *Crumpton*, the trial court erred in relying on its reading of *Riofta* to reject a favorable presumption. *See* CP at 676 (Conclusion of Law VI). *Crumpton* provides that "a court should evaluate the likelihood of innocence based on a favorable test result," not whether a single piece of evidence is strong or weak. 181 Wn.2d at 262. We therefore find that insofar as the trial court applied the wrong legal standard, it abused its discretion.

4. The Trial Court Did Not Abuse Its Discretion in Denying Further DNA Testing

The trial court's erroneous conclusion that RCW 10.73.170 does not require a favorable presumption resulted in no reversible error. The trial court alternatively held that "even if the Court were to apply the standard rejected in Conclusion [of Law VI], in light of the results of the testing of the shoelace, Gentry would still be unable to meet the 'onerous' substantive standard of Subsection (3)." CP at 676-77 (Conclusion of Law VII). Thus, the court's decision ultimately rests on the correct legal standard.

The key question, then, concerns whether it is proper for a trial court to consider "newly discovered" postconviction DNA evidence alongside the trial evidence and the presumably favorable untested DNA evidence. The statute is silent on this issue, and our cases to date have not presented this situation. In past cases, we

have been faced only with circumstances where a court considers probable innocence in light of the trial evidence and presumably favorable untested DNA evidence. *See Riofta*, 166 Wn.2d at 358; *State v. Thompson*, 173 Wn.2d 865, 271 P.3d 204 (2012); *Crumpton*, 181 Wn.2d at 265. While *Riofta* said that courts must view "all of the evidence presented *at trial* or *newly discovered, favorable DNA test results*," 166 Wn.2d 367 (emphasis added), it did not involve the issue here: whether a court can or should consider new DNA test results as they come in when determining whether to allow further testing. Or must a court ignore any new results and consider only the evidence admitted during trial and presumably favorable DNA test results?

Gentry argues that allowing consideration of new DNA evidence before all the testing is completed results in de novo review of a granted order under RCW 10.73.170. Gentry says such a rule would defeat the purpose of RCW 10.73.170 by making DNA testing orders subject to constant reconsideration and revision. However, Gentry does not cite any authority for the proposition that a court cannot modify a previous order when new evidence is discovered and a party moves for relief. Further, RCW 10.73.170 contains no language prohibiting a trial court from modifying an order granting postconviction DNA testing.

We interpret RCW 10.73.170 in a way that balances the interests of fairness and finality. DNA testing of multiple items will almost always result in evidence coming in piece by piece, and it does not seem unreasonable to test the most significant items first to see whether further testing is necessary.

We conclude that trial judges do have the discretion to consider all relevant evidence in deciding a question under RCW 10.73.170. Such a rule is fair to both parties and supports finality. We find nothing in the statutory scheme that prohibits a trial court from cutting off further testing once it has new evidence that makes it impossible for a convicted person to meet the statutory burden of showing "the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis." RCW 10.73.170(3).

The issue remains as to whether Judge Forbes abused her discretion in concluding that even with a favorable presumption as to the yet untested DNA evidence, Gentry cannot show a reasonable probability that he is innocent. This inquiry requires considering the evidence at trial, the results of the new DNA test from the left shoelace, and the favorable presumption that the remaining DNA testing would exculpate Gentry.

The evidence at trial establishing Gentry's guilt beyond a reasonable doubt included DNA testing of blood found on the shoelaces seized from Gentry's home, which did not eliminate the victim, Cassie Holden, as the source of the blood. Our decision upholding Gentry's conviction noted that the bloodstained shoes and laces were a key piece of inculpatory evidence. *See Gentry*, 125 Wn.2d at 580-81, 604. The recent DNA test of the left shoelace confirmed the presence of the victim's blood to a high degree of certainty. CP at 520. Remaining evidence to be tested includes bloodstains on Gentry's shoes and hairs found on Holden's body. *See* CP at 487-91 (listing the items that are subject to DNA testing).

It seems unlikely that further testing of the hairs will aid Gentry's actual innocence claim. Even assuming the further testing shows the hairs did not belong to Gentry, evidence at trial showed that many sources could have deposited the hairs. VRP (No. 58415-0) (May 17, 1991) at 209 (testimony that on the day of the murder at least one African-American child was playing at the victim's home); 208 (testimony that on the day of the murder, the victim spoke with a young girl who was being supervised by an African-American babysitter); VRP (No. 58415-0) (May 15, 1991) at 3820, 2826 (testimony that the victim's brother sometimes played with three African-American friends). However, the presence of another person's hair on Holden's body does not mean that Gentry is innocent. *See Riofta*, 166 Wn.2d at 370-71 (noting that the presence of another person's DNA evidence on a hat found at the crime scene is not evidence that someone other than the defendant committed the crime).

Further testing of the blood found on the shoes presents a closer question, however. Assuming such testing is favorable to Gentry requires assuming the results do not identify Cassie Holden as the source of the blood. Thus, the court would have blood evidence on the left shoelace that matches Holden's DNA profile to a high degree of certainty alongside blood evidence on the shoes that does not match. The question is whether this evidence, considered in conjunction with the trial evidence and the further "evidence" that the DNA hair test results do not match Gentry's DNA profile, demonstrates Gentry's innocence on a more probable than not basis. More precisely, the question is whether the trial court abused its discretion in concluding it

-19-

does not. While reasonable judges could disagree and some might allow further testing of at least the remaining blood evidence, Judge Forbes's decision falls within the range of acceptable decisions and was not an abuse of discretion under RCW 10.73.170.

While the trial court embraced an incorrect legal standard contrary to our holding in *Crumpton*, the order denying further DNA testing alternatively rested on application of the correct legal standard. We read RCW 10.73.170 as allowing trial courts to consider all evidence, including newly discovered DNA test results, when considering a motion to deny further DNA testing, and conclude that the trial judge here acted within her sound discretion.

## CONCLUSION

We affirm the trial court. Gentry's request that Judge Forbes recuse herself was not an affidavit of prejudice, and the judge did not abuse her discretion in declining to recuse. The trial judge also acted within her discretion in granting the State's motion to deny further DNA testing. Though the court recited an incorrect legal standard, the order also rested on application of the correct standard and the sustainable conclusion that further DNA testing would not demonstrate Gentry's innocence on a more probable than not basis.

Stephens, J

WE CONCUR:

Madsen, C.J.

Wiggins, J.

Johnson, J.

Gen, J

Owens, J

Johanson, J.P.T.

Fairhurst, J.

Maxa, J.P.T.