IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59167-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| DERRICK KEITH BURGESS, | |
| Appellant. | |

PRICE, J. — Derrick K. Burgess appeals his three convictions of rape of a child in the third degree.  Burgess argues that the trial court violated his right to present a defense when it excluded evidence of the victim's juvenile convictions.  Burgess also argues that the State committed prosecutorial misconduct during closing argument by bolstering the victim's credibility.  We disagree and affirm.

FACTS

I. BACKGROUND

In October 2020, Burgess and his stepsister, R.B., were both visiting their father/stepfather. Burgess, who was 30 years old at the time, and R.B., who was 14, would regularly spend time together during the visit.  They would watch movies, talk, go out and get food, go shopping, and send each other messages over Snapchat.[1]

---

[1] "Snapchat is a cell phone app similar to text messaging except that photos and texts sent through Snapchat disappear once they are seen by the recipient and are not preserved."  *Nelson v. Duvall*, 197 Wn. App. 441, 445 n.1, 387 P.3d 1158 (2017).

At some point, Burgess began "flirting" with R.B. over their Snapchat messages. 2 Verbatim Rep. of Proc. (VRP) at 519. This "flirting," eventually led to Burgess committing sexual acts with R.B. on multiple occasions. But soon R.B. began to feel like what Burgess did with her was wrong, and she told her friend, N.W., about what had happened. N.W., in turn, told her foster mother, who later told R.B.'s stepfather. The stepfather then reported the allegations to the police.

Following further investigation, Burgess was charged with three counts of rape of a child in the third degree.

## II. EXCLUSION OF R.B.'S JUVENILE CONVICTIONS

Earlier in 2020, R.B. had been convicted twice as a juvenile of taking a motor vehicle without permission in the second degree. She was convicted (in an unsealed adjudication) after taking her stepfather's car in April 2020. And she was convicted (in a sealed adjudication), with N.W. as a codefendant, of taking N.W.'s foster mother's car in May 2020. Prior to the start of trial, the State moved in limine under ER 609(d) for the exclusion of the two convictions.

For the April 2020, unsealed conviction, the State contended that the probative value did not outweigh the prejudice that admitting the conviction would cause to R.B. The State conceded that the conviction was a crime of dishonesty and would have been admissible if R.B. had been an adult. However, because the conviction occurred while R.B. was a juvenile, the State argued that the conviction was barred under ER 609(d). According to the State, this juvenile conviction was not necessary "for a fair determination of the issue of guilt or innocence in this case," as required by the rule. 1 VRP at 54.

For the May 2020, sealed conviction, the State argued that the trial court did not even need to consider ER 609(d). The State contended that a sealed conviction is not "actually consider[ed] . . . to be a conviction." 1 VRP at 64.

Burgess responded that both of R.B.'s convictions fell under ER 609(d)'s exception and should, therefore, be available for impeachment. Burgess argued that not only were these convictions admissible if she were an adult, but the case "hinge[d] upon the credibility of [R.B.]." 1 VRP at 55. This made her convictions for crimes of dishonesty "necessary" and "highly probative." 1 VRP at 55.

Burgess also argued that exclusion of R.B.'s juvenile convictions implicated his right to confront and cross-examine witnesses. In addition to these convictions being relevant to R.B.'s credibility in general, Burgess contended that they were especially relevant here because they occurred within six months of when the alleged sexual assaults occurred. According to Burgess, the implications of the convictions themselves combined with their timing in relation to R.B.'s accusations placed so much importance on this evidence that it did not matter that the May 2020 conviction was sealed.

After hearing arguments from both parties, the trial court expressed concerns about balancing the impact the evidence might have on perceptions of child rape victims with its relevance to R.B.'s credibility:

> [T]he probative value of this information is the veracity of the witness. The concern of the [c]ourt is that the prejudicial value is that the jurors, regardless of any corrective instruction, knowing of this conviction, could tend to perceive the alleged victim in a certain way. As a certain type of a character trait. Outside of just veracity issues.

> And I'm really sensitive in the issues when we deal with child rape—charges as to a perception of a bad person. . . .
>
> I think that the [d]efense has brought up some good points. We're dealing with a six month span between . . . that incident and this incident.
>
> There's probative value there, there's prejudicial value there, and I [need to] figure out which is greater.

1 VRP at 59-61.

The next day, the trial court orally granted the State's motion in limine, ruling that both R.B.'s May 2020 and April 2020 convictions would be excluded. First, with respect to the May 2020 sealed conviction, the trial court simply ruled that the conviction was inadmissible because it was sealed. Relying on the language of the sealing order, the trial court explained that the May 2020 conviction

> cannot be utilized for any purposes without going back to the juvenile court and making that request. And, it—it appears it can only be made by the person who is the subject of the information, which would be [R.B.] herself. So, that will not be allowed due to the nature of the sealing.

1 VRP at 85.

Second, the trial court ruled that the unsealed April 2020 juvenile conviction was inadmissible under ER 609(d). The trial court began by first emphasizing that evidence of a juvenile conviction "generally, is not admissible," and thus, the trial court would have to find an exception in order to rule in favor of Burgess. 1 VRP at 86.

While the trial court acknowledged Burgess' argument in favor of admission, it was ultimately unpersuaded by Burgess' defense theory; specifically, that R.B. was generally dishonest; meaning, she was previously dishonest when she was convicted of crimes of dishonesty so she was likely being dishonest now about the allegations. The trial court went on to explain

4

that merely showing general dishonesty was an insufficient basis to get past ER 609(d)'s general presumption against admissibility:

> That's not how I see rule 609. I see rule 609 is that we have a witness up on the stand, and the use of prior convictions is utilized for the purposes of impeaching the witness' testimony on the stand. I suppose that there is an argument that can be made that well, it should extend beyond and [that] at a certain she was a dishonest person.
>
> That's not rule 609. [Rule] 609 is[: "]as the witness testifies[,] is the witness credible[?"] [A]nd ["]does this order, does this conviction back when she was a juvenile relate to whether she, who is now an adult, is a dishonest person[?"] [A]nd ["]should their testimony be looked to—unfavorably because they have a conviction based upon dishonesty[?"]

1 VRP at 86-87.

The trial court also appeared to express skepticism about the necessity of this evidence in proving Burgess' defense theory, especially in light of the prejudice it would cause R.B, who was now years older than she was when the allegations occurred.

> We're dealing with the difference between . . . . [a] 14 year old and an 18 year old and I think that's a loop. I—I think that there's a reason why juvenile convictions are generally not utilized because there's a whole lot of growth that occurs, maturity that occurs, a whole lot of things that happen to the brain itself that serves to minimize some of the things that a juvenile has. Part of the reason that we seal the juvenile records is to give them a fresh start when they become an adult because they do things as a juvenile that [they] would not otherwise . . . do as an adult.
>
> So, what we're dealing with is an adult who is on the stand and say oh, by the way when you were a juvenile you were dishonest, therefore you're not credible today and I'm not gonna allow it. So, the State's motion . . . is granted.

1 VRP at 87.

III. R.B.'S TESTIMONY

The case proceeded to a jury trial in November 2023. R.B. began her testimony by describing her interactions with Burgess while they were both staying with her stepfather. R.B.

testified that when she communicated with Burgess there would be "a little bit [of] like flirting . . . back and forth." 2 VRP at 519. R.B. said that Burgess "hinted" at R.B. doing sexual favors for him, and she said that he, at one point, had asked her to send him sexually explicit photos of herself. 2 VRP at 519.

R.B. testified that in their Snapchat messages she would ask Burgess to buy her alcohol, marijuana, and nicotine products. Burgess would respond that he would give her these things "only if [she] gave him something in return," which she understood to be an insinuation that he wanted sexual intercourse. 2 VRP at 518. According to R.B., Burgess eventually had sexual contact with her on four occasions in October 2020. R.B. testified in detail about what Burgess did to her during each of the four occasions.

When asked by the State whether this contact was "forced," R.B. responded that she had not been forced. 2 VRP at 529. However, because she began to feel that what had happened was wrong, R.B. finally told her friend, N.W., about it.

R.B. testified that she never reported Burgess to the police, but she eventually found out about a police investigation from her mother. As part of the investigation, R.B. said that she participated in a medical evaluation and a forensic interview. Since making the allegations, R.B. had not seen or heard from Burgess.

IV. PAULA BLANDIN'S TESTIMONY

Paula Blandin, N.W.'s foster mother, testified that Burgess and R.B. were close before the allegations. Blandin lived in a house on the same property as R.B.'s stepfather and explained that when R.B. would visit her stepfather, she would often stay over and sleep in N.W.'s room. Burgess

6

did not visit his father often, but "the kids loved it" whenever he did come—"[h]e did a bonfire and just all the kids liked when [Burgess] was around." 2 VRP at 562.

Blandin testified that in October 2020, Burgess and R.B. were both visiting and would spend a lot of time together and would go out and get food or coffee and come back together.

Blandin never observed Burgess sexually assault R.B., but when she found out about the allegations from N.W., she told R.B.'s stepfather, who, in turn, reported the allegations to child protective services and the sheriff's department.

## V.  DOCTOR GILBERT'S TESTIMONY

Dr. Gilbert, a pediatrician, testified that R.B. had been referred to her clinic for a physical evaluation.  The results from the examination were "normal" and there was no evidence of trauma or scarring in her genital area.  However, Dr. Gilbert went on to explain that unless they examine a child within 3 to 5 days of the sexual contact, "95 [percent] of the time [they] will have a normal examination" without signs of injury or changes to the body.  2 VRP at 587.  Because of this, a "normal" physical examination was not indicative of whether sexual abuse did or did not occur.  She explained:

> Well, the possibility is that there was sexual abuse or a sexual encounter and there's no signs or symptoms of any abnormalities or any residual.  There's also the possibility that there was an injury that caused scar tissue that we could see.  And again, that's less than 5 [percent] of the time.  And then, there's the possibility that no sexual encounter occurred, no sexual abuse occurred and the exam was normal.  Those are our three possibilities when we do an exam on a child.

2 VRP at 588.

VI. CLOSING ARGUMENTS

During closing arguments, Burgess suggested that R.B. was not credible. He pointed to missing pieces in the evidence and contended that "the details of [R.B.'s] story change, depending on who she's talking to and when." 2 VRP at 710.

In rebuttal, the prosecutor acknowledged that the jury might have some uncertainty about R.B.'s credibility. But the prosecutor implored the jury, even in the absence of evidence showing whether R.B. was honest or not, to reject the theory that missing evidence meant that R.B. was dishonest. Instead, the prosecutor argued that the jury "could also presume she's honest." 2 VRP at 729. The State then went on to explain why the jury could make that presumption based on her testimony at trial:

> *And I submit to you what you got from [R.B.] is the truth.* It's the truth because she went over to that house and she got along with her stepbrother. You heard from Paula Blandin testify that they got along great. It was hard to keep them separated. But what did [R.B.] say after the allegations were made and after they reported it to law enforcement? She's had no contact with him since then.
>
> . . . What flipped the switch is [R.B.] realized she should not have had sexual intercourse with her stepbrother 15 years older. [R.B.] realized that her stepbrother took advantage of her because he knew he was her way to get marijuana, to get nicotine, to get alcohol. . . .
>
> Derrick Burgess had control of [R.B.], but Derrick Burgess didn't have control of [R.B.] when she came into testify. And she told you her story. . . .

2 VRP at 730 (emphasis added). Burgess did not object. The State then recounted the details of R.B.'s testimony about the four occasions of sexual contact.

The State went on to explain that it did not matter whether the Defense (or the State) believed R.B.'s testimony and it pointed the jury to look at the evidence presented at trial that could allow them to infer that R.B. was telling the truth:

8

It doesn't matter what [the defense] believes and it doesn't matter what I believe or not. But, if we were to believe the [d]efense's theory of this case that a he said she said just isn't enough, keep in mind what the doctor testified to. How do we know if two people have sexual relations[] th[at] occurred, if only those people are gonna know? If an injury occurred to the vagina, and we know that that happens in less than 5 [percent] of the cases and you'll only see that injury within, I believe she said three to six days.

Keep in mind the medical evaluation was done on—*I want to make sure this is right since, once again, what I say is not evidence*. December 16th, 2020. The allegations were from a period of October 5th—or October 1st through October 12th. So, we [have] got [a] two month span. Or what's the only other way that you would know somebody had sexual intercourse is if it results in a baby?

2 VRP at 730-31 (emphasis added).

The State finished its closing argument by returning to R.B.'s credibility:

All right. Surely you can convict based on a he said she said. Surely you can convict based upon nobody else witnessing an event. And how do you convict? You base it on the testimony of that witness making the allegations. *And I submit to you that witness, [R.B.], is credible.* And she is credible for every single step that I've outlined. Every single step.

2 VRP at 731 (emphasis added). Here, too, Burgess did not object.

The jury convicted Burgess of all three counts of third degree rape of a child.

Burgess appeals.

## ANALYSIS

Burgess makes two arguments on appeal. First, Burgess argues that his constitutional right to present a defense was violated when the trial court excluded reference to R.B.'s juvenile convictions. Second, he argues that the State committed prosecutorial misconduct by bolstering R.B.'s credibility during closing argument.

No. 59167-7-II

## I. RIGHT TO PRESENT A DEFENSE

Burgess supports his right to present a defense argument by contending that essential to his defense theory was that R.B. had made up these allegations. Because showing R.B. was dishonest was so important to this defense theory, Burgess argues that when the trial court used ER 609(d) to prevent him from impeaching R.B. with her past convictions, his constitutional right to present a defense was violated. We disagree.[2]

Under the state and federal constitutions, all criminal defendants possess " 'the right to a fair opportunity to defend against the State's accusations.' " *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)); Const. art. I, § 22; U.S. CONST. amend. VI. Within this right to present a defense are a defendant's rights to have an opportunity to be heard in his defense and to confront and cross-examine witnesses. *Jones*, 168 Wn.2d at 720. Although the constitutional right to present a defense is "basic to our system of jurisprudence," it is not absolute. *Id.* Judges have the discretion to " 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022) (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

---

[2] Before the trial court, Burgess objected based on the right to confrontation but did not specifically mention the right to present a defense. On appeal, neither party raises RAP 2.5(a) or whether the basis of Burgess' objection adequately preserved his right to present a defense argument. Because neither party raises these issues, we use our discretion to address Burgess' argument on the merits.

10

To analyze whether a defendant's right to present a defense has been violated, we use a two-step process. *Id.* at 58-59. The first step involves reviewing the trial court's rulings under the evidence rules. *Id.* If we find a prejudicial evidentiary error at the first step, we stop and " 'avoid the constitutional issue altogether.' " *Id.* at 59 (quoting *State v. Jennings*, 14 Wn. App. 2d 779, 800-01, 474 P.3d 599 (2020) (Melnick, J., concurring)).[3] But if there was no evidentiary error, or if the error was harmless, we move to the second step, which involves reviewing de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Id.* at 59.

A. THE FIRST STEP – WAS THERE AN EVIDENTIARY ERROR?

For the first step, we review the trial court's decision to admit or exclude evidence under the evidence rules for an abuse of discretion. *Id.* at 58-59. An abuse of discretion occurs when an evidentiary decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Gentry*, 183 Wn.2d 749, 761, 356 P.3d 714 (2015). Application of an incorrect legal standard is an abuse of discretion. *Id.* at 764.

ER 609(d) creates a general presumption against admitting evidence of juvenile convictions for impeachment of a witness. However, the rule also states that the trial court may allow admission of evidence of a witness' juvenile convictions for impeachment purposes in a criminal case if three requirements are met: (1) the witness is not the defendant, (2) the "conviction of the offense would be admissible to attack the credibility of an adult," and (3) "the court is

---

[3] "We should refrain from deciding a case on constitutional grounds unless it is absolutely necessary." *Jennings*, 14 Wn. App. 2d at 800 n.6.

satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence." ER 609(d).

To qualify for this exception, we have long held that the party seeking to admit the evidence for impeachment purposes carries a significant burden. *See State v. Gerard*, 36 Wn. App. 7, 12, 671 P.2d 286 (1983), *review denied*, 100 Wn.2d 1035 (1984). It is not enough for the party seeking admission to assert that evidence of a juvenile conviction would *generally* impeach the witness' credibility; they must demonstrate that the evidence was actually "necessary to determine guilt." *Id.* (affirming the exclusion of the juvenile conviction when the appellant failed to "give any reasons for admissibility beyond general impeachment of the witness' credibility").

For this first step, Burgess argues that the trial court abused its discretion by applying the incorrect legal standard when deciding to exclude both of R.B.'s April 2020 and May 2020 juvenile convictions. Burgess concedes that juvenile convictions are " 'generally not admissible' " under ER 609(d). Br. of Appellant at 10 (quoting ER 609(d)). But he argues that the trial court failed to properly apply the rest of the rule; that is, the requirement to determine if admission of the convictions "is necessary for a fair determination of the issue of guilt or innocence." Br. of Appellant at 10.

Burgess makes two different arguments for the two convictions. Specifically for the April 2020 unsealed conviction, Burgess argues that the trial court erroneously excluded the conviction "based on broad policy reasons" and general observations about how children mature, while "never consider[ing] the importance of the evidence to this trial or . . . Burgess'[] defense." Br. of Appellant at 16. By focusing on the simple fact that children grow up, Burgess contends that the

12

trial court's basis would essentially make a per se rule that all juvenile convictions are inadmissible and ER 609(d)'s exception would be rendered "meaningless." Br. of Appellant at 15.

We disagree that the trial court failed to apply the proper standard for this unsealed conviction. While it is true that the trial court referenced some of the "broad policy reasons" behind ER 609(d), the trial court appeared to focus on the specific facts of this case for its conclusion that the unsealed conviction was not "necessary for the fair determination of the issue of guilt or innocence." ER 609(d).

Characterizing Burgess' argument as being a general dishonesty argument (e.g., just because R.B. was dishonest in taking motor vehicles, she lied about the allegations), the trial court observed that this type of argument is generally insufficient to overcome the presumption against admitting juvenile convictions. The trial court next looked at the specific timeframe of the case and explained that the fact that R.B. may have been dishonest when she was 14 years old had minimal relevance to whether she was credible when giving testimony 4 years later, as an adult. This reasoning does not create a "per se rule" that all juvenile convictions are inadmissible; it is narrowly tailored to this case—the timing of R.B.'s convictions and her age at trial. Thus, the trial court did not abuse its discretion by excluding the April 2020 conviction under ER 609(d).

For the sealed May 2020 conviction, Burgess makes a different argument. He argues that the trial court erred when it excluded the conviction simply because it was sealed. He contends that because sealing juvenile convictions merely hides the convictions from public access (it does not erase them or preclude access to them by the trial court or the State), "the legislature did not intend to categorically preclude the [trial] court from using that information." Br. of Appellant at 13. He further contends that ER 609(d) does not distinguish between sealed and unsealed

convictions—demonstrating that the rule was not intended to categorically preclude the admission of sealed juvenile convictions. Thus, Burgess argues the trial court abused its discretion by failing to apply the proper standard.

We agree with Burgess that the trial court erred for the sealed conviction. Our Supreme Court has clarified that sealed convictions are only hidden from public view, not that the convictions themselves cease to exist. *Barr v. Snohomish County Sheriff*, 193 Wn.2d 330, 337, 440 P.3d 131 (2019). For example, sealed convictions still function to preclude someone from obtaining a firearm. *McIntosh v. State*, 30 Wn. App. 2d 224, 233-34, 544 P.3d 559, *review denied*, 3 Wn.3d 1010, *cert. denied*, 145 S. Ct. 773, 220 L. Ed. 2d 274 (2024). Sealed convictions also remain accessible to the courts, prosecutors, and state and out-of-state law enforcement agencies. *Id.* at 233. Moreover, Burgess is correct, ER 609(d) does not distinguish between sealed and unsealed juvenile convictions. *See* ER 609(d). Thus, while it could be appropriate to consider, among other things, whether a juvenile conviction is sealed when applying ER 609(d), it is error to make such a consideration dispositive of admissibility to the exclusion of all else.

Yet, the error was harmless. Burgess does not assert any additional arguments that R.B.'s May 2020 conviction should be admitted under ER 609(d) that he did not assert for the April 2020 conviction. Thus, even if the trial court had properly analyzed the admissibility of the May 2020 conviction under ER 609(d), Burgess still would not have overcome the general presumption against admissibility of evidence of juvenile convictions.

B.  THE SECOND STEP—WAS THERE A CONSTITUTIONAL VIOLATION?

Having concluded either that there was no evidentiary error, or that such error was harmless, we move to the second step—our de novo review of whether the trial court's ruling violated Burgess' constitutional right to present a defense. *Jennings*, 199 Wn.2d at 58.

For this second step, we employ the "*Hudlow* balancing test,"[4] weighing the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence. *Jennings*, 199 Wn.2d at 63.  In employing this test, we look at whether the evidence was of such " 'extremely high probative value' " that it was the defendant's *entire* defense, or whether the defendant was still able to advance their defense theory at trial without it.  *State v. Arndt*, 194 Wn.2d 784, 813-14, 453 P.3d 696 (2019) (quoting *Jones*, 168 Wn.2d at 721).  Such evidence cannot generally be excluded without violating the right to present a defense. *Jennings*, 199 Wn.2d at 65.  This distinguishes evidence that "merely bolsters credibility" from evidence that is "*necessary* to present a defense" and, because the evidentiary rules already govern what parties, including a defendant, can present at trial, "[t]he balance more often tips against a constitutional violation . . . ." *Jennings*, 199 Wn.2d at 66-67 (emphasis added); *State v. Caril*, 23 Wn. App. 2d 416, 431, 515 P.3d 1036 (2022), *review denied*, 200 Wn.2d 1025, *cert. denied*, 144 S. Ct. 125, 217 L. Ed. 2d 39 (2023).

Here, Burgess argues that because "[t]his case turned entirely on R.B.'s testimony," the trial court, in refusing to allow him to "us[e] R.B.'s multiple crimes of dishonesty to evaluate her

---

[4] First set forth in *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983), the *Hudlow* balancing test has been frequently used for determining when a criminal defendant's constitutional right to present a defense has been violated.  *See Jennings*, 199 Wn.2d at 63-65.

credibility," deprived him of his constitutional right to present a defense. Br. of Appellant at 19. He supports his argument by noting that the timeframe of R.B.'s convictions is in close proximity to the time of her allegations and that the convictions involved individuals (R.B.'s stepfather and Blandin) who were also witnesses at trial. Because the convictions were close in time to the alleged sexual assaults and because of the specific individuals involved, Burgess contends that the convictions are especially relevant to show R.B.'s propensity for dishonesty.

We are unpersuaded that Burgess' right to present a defense was violated. It is true that the convictions involved R.B.'s stepfather and Blandin (and N.W. was a codefendant for the May 2020 conviction), but that does not make the information "necessary," especially considering none of these third parties witnessed, or provided testimony about, the actual sexual assaults. It is also true that Burgess' defense was largely based on R.B.'s credibility, but, as noted above, the convictions had limited probative value to R.B.'s testimony at trial because of her age. Although Burgess emphasizes the close proximity of the convictions to the allegations, what is more important is R.B.'s age when she gave her testimony at trial. As pointed out by the trial court, R.B. was an adult (18 years of age) when she testified at trial consistently with her allegations from when she was 14—over three years after the convictions occurred.

This three-year gap is critical given that juveniles change. As repeatedly stated by our Supreme Court, " 'young people differ from adults' " when it comes to their culpability and potential for rehabilitation. *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 323, 482 P.3d 276 (2021) (quoting Terry A. Maroney, *The False Promise of Adolescent Brain Science in Juvenile Justice*, 85 NOTRE DAME L. REV. 94 (2009). The crimes young people commit or negative behaviors they engage in are less probative of whether they will engage in such behaviors in the

future, much less probative of whether they are simply a "bad," "criminal," or "dishonest" person. *See Miller v. Alabama*, 567 U.S. 460, 471-72, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Given this capacity to change, any relevance of specific instances of R.B.'s dishonesty at the age of 14 to her testimony at the age of 18 is mitigated by this passage of time. (We underscore, however, that under different facts, with, for example, different ages and different crimes, a different conclusion might result.)

Moreover, Burgess still had the opportunity to cross-examine R.B. on the stand to impeach her for the consistency of her testimony or expose any bias she may have had; thus, Burgess still had opportunities to challenge R.B.'s credibility.[5] Given these opportunities, even if the convictions would arguably have "bolstered" his defense theory, they were not "necessary" to his theory. *See Jennings*,199 Wn.2d at 66-67. Under the circumstances of this case, the convictions fall short of being of an " 'extremely high probative value' " that would outweigh the State's interest avoiding undue bias towards child victims of sexual assault. *Arndt*, 194 Wn.2d at 813-14 (quoting *Jones*, 168 Wn.2d at 721); *see also Jennings*, 199 Wn.2d at 66-67 (holding that under the *Hudlow* test defendant's right to present was not violated because toxicology report was not of such high probative value that its exclusion would not outweigh the State's interest in "avoiding

---

[5] At times, Burgess appears to reference the right to confrontation in addition to the right to present a defense in his briefing. We view these references to the right to confrontation to be supportive of his right to present a defense claim, rather than a separate argument. *See Caril*, 23 Wn. App. 2d at 431 (" '[T]he fundamental constitutional right of a criminal defendant to present a complete defense . . . encompasses the right to confront and cross-examine adverse witnesses.' " (quoting *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021)). To the extent that Burgess intended these references to constitute a separate argument, it was insufficiently briefed for us to address it. RAP 10.3.

[its] prejudicial and speculative effect"). Thus, we hold that the exclusion of R.B.'s juvenile convictions did not violate Burgess' right to present a defense.

## II. PROSECUTORIAL MISCONDUCT

For the first time on appeal, Burgess argues that the State committed prosecutorial misconduct during closing argument by improperly bolstering R.B. and that this misconduct could not have been cured by an instruction. We disagree.

To prevail on a claim of prosecutorial misconduct, a defendant must first demonstrate that the prosecutor's statements were improper and, second, that they were prejudicial. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Prejudice occurs when " 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Weber*, 159 Wn.2d 252, 270, 149 P.3d 646 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)). When a defendant fails to object at trial to a prosecutor's statements, a waiver is presumed unless the defendant can show that the statements were so flagrant and ill-intentioned that no instruction could have cured them. *State v. Warren*, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008).

When a prosecutor's alleged misconduct occurs in closing argument, we examine the conduct in " 'the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury.' " *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

Prosecutors cannot generally assert their personal beliefs about a witness's credibility or bolster a witness's character. *Warren*, 165 Wn.2d at 30. However, during closing argument, prosecutors are given wide latitude to make reasonable inferences, even about witness credibility,

so long as those inferences are supported by the evidence. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). This is especially true if, throughout the trial, the defense brought up the issue of "truth or lying" or elicited testimony questioning the credibility of the victim. *Id.* In such cases, "the question of such consistency bec[omes] fair game for comment in closing, where the prosecutor has great latitude to argue from the evidence." *Id.* Only " 'clear and unmistakable' " personal opinions are deemed prejudicial. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995) (quoting *State v. Sargent*, 40 Wn. App. 340, 344, 698 P.2d 598 (1985)).

Here, Burgess argues that the State improperly bolstered R.B.'s credibility when during closing arguments the prosecutor told the jury, "I submit to you what you got from [R.B.] is the truth," and then repeated this sentiment, saying, "I submit to you [R.B.] is credible." 2 VRP at 730-31. Burgess argues that, "[r]ather than arguing any specific evidence supported [R.B.'s] credibility, the prosecutor simply stated he personally believed R.B. was credible." Br. of Appellant at 21-22. He contends that the prosecutor's statements "essentially resolved a central fact" and thus no instruction could have cured the misconduct because R.B.'s testimony was the only direct evidence implicating Burgess' guilt. Br. of Appellant at 22.

We disagree that the State's remarks were improper. First, the statements themselves stop short of being a statement of personal belief. The phrasing "I submit" at the outset of the statement is not the same as when a prosecutor says, for example, "I *personally believe* that [witness] is telling the truth." *See United States v. Vazquez-Larrauri*, 778 F.3d 276, 284-85 (1st Cir. 2015) (observing that "I submit" is not necessarily an indication of a personal belief but is, rather, an ambiguous term that "can mean 'to present or propose to another for review, consideration or decision.' " (quoting *Merriam-Webster's Collegiate Dictionary* 1244 (11th ed. 2012)). At a

minimum, the phrasing of "I submit" created ambiguity, making the statements well short of "clear and unmistakable" personal opinions. *Brett*, 126 Wn.2d at 175.

Second, because Burgess focused his defense on R.B.'s credibility, claiming, for example, in closing arguments that her statements changed "depending on who she's talking to and when," 2 VRP at 710, it was "fair game" for the State to make reasonable inferences from the evidence addressing R.B.'s credibility, so long as the inferences were supported by evidence. *See Thorgerson*, 172 Wn.2d at 448. And here, the State supported its statements about R.B.'s credibility with the evidence, including trial testimony. Immediately after the prosecutor's statement about R.B. telling the truth, the prosecutor discussed specific testimony, including Blandin's observations of R.B.'s close relationship with Burgess, R.B.'s testimony that she no longer spoke with Burgess after the allegations, and Dr. Gilbert's testimony that the absence of visible injuries to her genitals was not indicative of her allegations being false. With these supportive references to the testimony (coupled with the prosecutor's reminder to the jury that "it does not matter" what the lawyers believe), the prosecutor's statements were within the "wide latitude" afforded to prosecutors to make inferences about witness credibility. *See Thorgerson*, 172 Wn.2d at 448.

Thus, the State's remarks were not improper bolstering of a witness and Burgess' prosecutorial misconduct claim fails.

## CONCLUSION

We affirm Burgess' convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
PRICE, J.

We concur:

_____
CRUSER, C.J.

_____
GLASGOW, J.